Paul VARACALLO, Steven E. Feldman, K. Werner Gass, Jeremiah B. Walsh, William A. Karges, Jr., Jeffrey M. Weiner, as Trustee of the Karges Irrevocable Trusts I and II, and Donald A. Wofford, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Connecticut Mutual Life Insurance Company, C.M. Life Insurance Company, MML Bay State Life Insurance Company, Defendants.

Civil Action No. 04–2702 (JLL).

United States District Court, D. New Jersey.

Feb. 15, 2005.

---

**2.** *See also* S.D.N.Y. Civ R. 11(a).

**3.** 532 U.S. 757, 121 S.Ct. 1801, 149 L.Ed.2d 983 (2001).

**4.** *Id.* at 763, 121 S.Ct. 1801.

**6.** *Id.* at 764, 121 S.Ct. 1801.

Allyn Z. Lite, Esq., Bruce D. Greenberg, Esq., Lite, DePalma, Greenberg & Rivas, LLC, Newark, NJ, Andrew S. Friedman, Esq., Bonnett, Fairbourn, Friedman, Balint, P.C., Phoenix, AZ, John J. Stoia, Jr., Esq., Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San Diego, CA, David J. Manogue, Esq., Joseph N. Kravec, Jr., Esq., Specter, Specter, Evans & Manogue, P.C., Pittsburgh, PA, Howard D. Finkelstein, Esq., Finkelstein & Krinsk, LLP, San Diego, CA, Barry A. Weprin, Esq., Milberg, Weiss, Bershad & Schulman, LLP, New York, NY, for plaintiffs.

John P. Hooper, Esq., Eric F. Gladbach, Esq., Edwards & Angell, LLP, New York, NY, Robert Novack, Esq., Short Hills, NJ, for defendants.

Raju Sandaron, Esq., Bronx, NY, Sidney Dickstein, Esq., Dickstein, Shapiro, Morin & Oshinsky, Washington, D.C., William Kenneth C. Dippel, Esq., Dippel & Davis, Dallas, TX, Eric P. Finamore, Esq., Weston, Patrick, Willard & Redding, Boston, MA, R. Stephen Griffis, Esq., Hoover, AL, Dennis Monaghan, Esq., Graham, Curtin and Sheridan, Morristown, NJ, David Nieporent, Esq., Coleman Law Firm, Clifton, NJ, Kenneth E. Nelson, Esq., Nelson Law Firm, P.C., Kansas City, MO, Edward Cochran, Esq.[1], Cochran and Cochran, Shaker Heights, OH, for objectors.

David Miller, Esq., Somerville, MA, pro se.

Michael Ginsburg, Boca Raton, FL, pro se.[2]

Franklin J. Mucklow, Wyckoff, NJ, pro se.

Arlene Timmick, Frederick, MD, pro se.

---

1. This Amended Opinion has been filed to reflect very minor structural and grammatical changes, and in no way affects the analysis or substantive aspects of the original Opinion filed on February 4, 2005.

2. Mr. Cochran did not submit a Notice of Intent to Appear. A Notice of Intent to Appear was submitted on behalf of these Class Members, however, by Stephen Tsai as part of their objections. (*See* Docket Entry # 106).

**AMENDED OPINION[3]**

LINARES, District Judge.

## TABLE OF CONTENTS

Introduction .................................................................214
Findings of Fact and Conclusions of Law .....................................215

 I. Background Page...........................................................215
 A. Materials Considered by the Court .....................................215
 B. History of the Litigation Against MassMutual ...........................215
 C. Plaintiffs' Allegations Against MassMutual .............................216
 D. The Parties and Their Counsel.........................................217
 1. The Class Representatives .........................................217
 2. Class Counsel .....................................................217
 3. The Defendants ...................................................218
 4. Defendants' Counsel ..............................................218
 E. The Settlement .......................................................218
 F. The Preliminary Approval Order .......................................219
 G. The Fairness Hearing .................................................219

 II. Terms and Value of the Settlement Agreement ..............................221
 A. Class Members with Permanent Policies are Entitled to Either General
 Policy Relief or Claim Review Relief....................................221
 B. Class Members with Term Life and/or Disability Income Policies May
 Submit Claims to the Claim Review Process ...........................222
 C. The Claim Review Process ............................................222
 D. The Release ..........................................................223
 E. Value of the Relief ...................................................223

 III. Jurisdiction ..............................................................223
 A. Subject–Matter Jurisdiction ...........................................223
 B. Personal Jurisdiction .................................................224

 IV. Notice to Class Members ..................................................224

 V. Class Certification ........................................................228
 A. Numerosity ..........................................................229
 B. Commonality and Predominance ......................................230
 C. Typicality ............................................................232
 D. Adequacy of Representation ...........................................233
 E. Superiority ...........................................................233
 F. This Settlement Class Meets All the Requirements of Federal Rules of
 Civil Procedure 23(a), (b)(2), and (b)(3) ...............................234

 VI. Fairness of the Settlement.................................................235
 A. Complexity, Expense and Duration of the Litigation .....................236
 B. Class Reaction to the Settlement ......................................237
 C. The Stage of Proceedings and Amount of Discovery Completed .............238
 D. The Risks of Establishing Liability and Damages.........................238
 E. The Risks of Maintaining the Class Action Through Trial..................239
 F. The Ability of the Defendants to Withstand a Greater Judgment ............239
 G. The Range of Reasonableness of the Settlement Fund in Light of the
 Best Possible Recovery and the Attendant Risks of Litigation.............239
 H. Class Counsel's Approval of the Settlement .............................240
 I. The Proposed Relief to the Injured Policyholders .......................240
 J. The Remaining Objections to the Proposed Settlement ...................240
 1. Objections to the Terms of the Settlement ..........................241
 (a) Objections to the General Policy Relief.........................241
 (b) Objections to the Claim Review Process.........................242

---

3. Mr. Ginsburg indicated at the Fairness Hearing that he opted out of the class-therefore he did not have standing to object. (Transcript of Nov. 22, 2004 Fairness Hearing ("Tr") at 100).

 (c) Objections to the Scope of the Release .............................244
 2. Objection as to Lack of an Expert Valuation Report ....................245
 3. Objection on the Theory that MassMutual Could Demutualize ...........245

VII. Attorneys' Fees and Expenses, and Incentive Awards for Named Plaintiffs .....248
 A. Attorneys' Fees and Expenses ........................................248
 1. Method for Determining Fee Award ................................248
 2. Application of the Percentage–of–Recovery Method ....................249
 3. The Gunter Analysis .............................................250
 (a) Size of Fund and Number of Persons Benefitted ..................250
 (b) Presence or Absence of Substantial Objections .....................251
 (c) Skill and Efficiency of Counsel ...................................252
 (d) Complexity and Duration of Litigation ...........................252
 (e) Risk of Nonpayment .........................................253
 (f) Amount of Time that Counsel Devoted to Case .....................253
 (g) Awards in Similar Cases .......................................253
 4. Application of the Lodestar Recovery Method .........................254
 5. Reimbursement of Expenses .......................................256
 B. Incentive Awards for Named Plaintiffs ...............................257
Conclusion ...................................................................259

## INTRODUCTION

Before this Court are (1) an application by the parties for approval of the Proposed Settlement [4] of this proposed class action that is memorialized in a Settlement Agreement dated June 23, 2004, with exhibits (hereinafter the "Settlement Agreement" or "Settlement" or "S.A."),[5] (2) an application for an award of attorneys' fees and reimbursements of expenses to Class Counsel, and (3) an application for incentive awards for the representative Plaintiffs. For the reasons set forth below in its Findings of Fact and Conclusions of Law, the Court has determined that the Settlement is fair, reasonable and adequate and should therefore be approved. In addition, the Court grants the application for attorneys' fees and expenses, and grants in part the application for incentive awards for the Representative Plaintiffs. Contemporaneously, the Court has issued a Final Order and Final Judgment Approving Class Action Settlement and dismissing the Class Action Complaint in this action with prejudice, granting the application for attorneys' fees and expenses, and granting in part the application for incentive awards.

4. Class Counsel has reported to the Court that this is the nation's third largest insurance sales practices settlement, behind *Prudential* and *Met-Life*. (Transcript of Nov. 22, 2004 Fairness Hearing ("Tr") at 8). The settlement in *Prudential* involved in excess of eight million Class Members and a settlement value of between $1.209 billion and $2.077 billion. *See In re the Prudential Ins. Co. of Am.* ("*Prudential I*"), 962 F.Supp. 450, 495, 510 (D.N.J.1997), *aff'd*, 148 F.3d 283 (3d Cir.1998) ("*Prudential II*"), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999). *MetLife's* settlement involved in excess of six million Class Members and a settlement value of $1.645 billion. *See In re Metro. Life Ins. Co. Sales Practices Litig.* ("*MetLife*"), 1999 U.S. Dist. LEXIS 22688, at *30, 44–45 (W.D.Pa. Dec. 28, 1999). This Proposed Settlement involves about three million policies and a settlement value of at least $698.7 million, plus the value of injunctive relief, Part VIII ADR Relief, attorneys' fees and expenses, and administrative costs. (*See* Affidavit of Godfrey Perrott submitted with Joint Motion for Final Approval ("Perrott Affid."), Ex. B at 2, District of New Jersey CM/ECF Docket Entry ("Docket Entry") # 116; Declaration of Terry M. Long, FSA, MAAA in Support of Final Approval of Stipulation of Settlement submitted with Plaintiffs' Motion for Settlement Approval ("Long Decl.") at ¶ 15, Docket Entry # 114).

5. The Settlement Agreement was submitted to the Court under seal as part of the parties' Joint Motion for Preliminary Approval. (Docket Entry # 3). It was unsealed a few days later. As it was no longer under seal, the Settlement Agreement has been available for viewing electronically on CM/ECF at Docket Entry # 20.

## FINDINGS OF FACT AND
## CONCLUSIONS OF
## LAW

### I. BACKGROUND

#### A. Materials Considered by the Court

In reaching its decision in this case, the Court has reviewed and considered (a) the Settlement Agreement dated June 23, 2004, with its attached exhibits, and definitions included therein, filed with this Court on June 23, 2004; (b) Plaintiffs' Complaint; (c) the briefs, affidavits and other materials filed in support of the Settlement; (d) the written objections submitted by Class Members; (e) the affidavits and reports filed in support of the Settlement; (f) the record at the Fairness Hearing on November 22, 2004; (g) the documents listed on the docket sheet or otherwise submitted to the Court; and (h) all prior proceedings in this Action.

#### B. History of the Litigation Against MassMutual

According to the parties' submissions, over the past nine years, Class Counsel have filed a number of putative class action sales practices cases against MassMutual in several states, which have been litigated in both the trial and appellate courts. *See, e.g., Varacallo, et al. v. Massachusetts Mut. Life Ins. Co.*, No. ESX–L–3403–97 (Superior Ct., Law Div., Essex County, N.J.) (class certification was granted and the pending motions to supplement the witness list were not resolved because these settlement discussions commenced); *Karges, et al. v. Massachu-* setts *Mut. Life Ins. Co.*, No. GIC–713920 (Superior Ct., San Diego County, Cal.) (class certification was granted and the case was scheduled for trial until these settlement discussions commenced); *Gass, et al. v. Massachusetts Mut. Life Ins. Co.*, No.2000–05–2010 (Ct. of Common Pleas, Summit County, Ohio) (the trial court granted Mass-Mutual's motion for summary judgment and denied plaintiffs' motion for summary judgment and class certification; the appeal was stayed pending approval of the proposed settlement in this action); *Russo, et al. v. Massachusetts Mut. Life Ins. Co.*, No. 96–0368 (Supreme Ct., Tompkins County, N.Y.) (plaintiffs' appeal of the denial of class certification was withdrawn in favor of the settlement of this case); *O'Brien, et al. v. Massachusetts Mut. Life Ins. Co.*, Civil Action Number 95–1594 (Superior Ct., Suffolk County, Mass.), subsequently transferred to and renumbered as Civil Action Number 96–0160 (Superior Ct., Hampden County, Mass.); *Wofford, et al. v. Massachusetts Mut. Life Ins. Co.*, Case No. GIC–795696 (Superior Ct., San Diego County, Cal.) (on April 9, 2004 the court set a trial readiness conference).[6] (Defendants' Memorandum of Law in Support of Final Approval of Class Action Settlement ("Def.Settle.Mem.") at 4, Docket Entry # 116).

Each of these cases had to surmount a threshold motion to dismiss and entailed significant discovery. For example, in the three "vanishing premium" cases, *Varacallo*, *Russo*, and *Karges*, over 800,000 pages of

---

**6.** In addition to the foregoing cases, the following are additional cases that have been brought against MassMutual or Connecticut Mutual, but that were unsuccessful in pursuing class certification: *Cunningham v. MassMutual*, No. 4:95–CV–417–B–B (N.D.Miss.) (the case settled and a judgment dismissing the case with prejudice was entered on March 4, 2000); *Thelen v. MassMutual*, 111 F.Supp.2d 688 (D.Md.2000) (MassMutual successfully moved to dismiss and the order was entered on March 30, 2000); *Shocklee v. MassMutual*, No. 00–0279–D–1 (M.D.La.) (summary judgment was granted in favor of MassMutual on April 28, 2003, and that order was affirmed on appeal at 369 F.3d 437 (5th Cir.2004)); *O'Brien v. MassMutual*, No. 96–0160 (Mass. Superior Ct.) (the case settled and was dismissed by the court on March 20, 2000); *Elliott v. MassMutual*, No. 333733 (Az. Superior Ct.) (the court granted MassMutual's motion for summary judgment and, pursuant to the parties' stipulation, the case was dismissed on September 9, 2002); *McCown v. Hayden, et al.*, No. 01–03867 (193rd Jud. Dist. Dallas County, Tex.) (the appellate court affirmed the denial of class certification and dismissed the entire case on April 22, 2004); *Markarian v. Conn. Mut. Life Ins. Co.*, 202 F.R.D. 60 (D.Mass. 2001) (class certification was denied and plaintiff's appeal was dismissed with prejudice on March 13, 2002); *Cohn v. Mass. Mut. Life Ins. Co.*, 189 F.R.D. 209 (D.Conn.1999) (defendants' motion to dismiss plaintiffs' claims alleging breach of fiduciary duty and violation of the Connecticut Unfair Insurance Practices Act was granted, plaintiffs' motion for class certification was denied, and on October 20, 1999, the Second Circuit declined to hear plaintiffs' appeal).

documents were produced by MassMutual. Additional documents were produced by MassMutual in the *Gass* "churning" case and the *Wofford* "juvenile smoker" case. In addition to document production, the Plaintiffs also took more than 25 depositions in these cases, conducted interviews of numerous officers and employees of MassMutual, and solicited expert opinions. (Brief of Plaintiffs in Support of Final Approval of Proposed Settlement ("Pl.Settle.Mem.") at 5, Docket Entry # 114; Def. Settle. Mem. at 5). In both *Varacallo* and *Karges,* the Plaintiffs succeeded in obtaining class certification. *See Varacallo v. Mass. Mut. Life Ins. Co.,* 332 N.J.Super. 31, 752 A.2d 807 (App.Div.2000); *Mass. Mut. Life Ins. Co. v. Superior Ct.,* 97 Cal. App.4th 1282, 119 Cal.Rptr.2d 190 (2002). (*See also* Declaration of Andrew S. Friedman in Support of Request for Final Approval of Proposed Settlement ("Friedman Decl.") at ¶¶ 23–24, 72–74, Docket Entry # 114).

### C. Plaintiffs' Allegations Against MassMutual

Individually and on behalf of all other persons similarly situated, Paul Varacallo, Steven E. Feldman, K. Werner Gass, Jeremiah B. Walsh, William A. Karges, Jr., Jeffrey M. Weiner, as Trustee of the Karges Irrevocable Trusts I and II, and Donald A. Wofford (hereinafter "Plaintiffs" or "Class Representatives") filed a Class Action Complaint on June 10, 2004 against Massachusetts Mutual Life Insurance Company, Connecticut Mutual Life Insurance Company, C.M. Life Insurance Company, and MML Bay State Life Insurance Company (hereinafter "Defendants" or "MassMutual").[7] (*See* Complaint ("Compl."), Docket Entry # 1). The Complaint is brought on behalf of a class of persons or entities (hereinafter the "Class" or "Class Members") who own or owned one or more of the following types of Policies issued between January 1, 1983 and December 31, 2003:(i) Permanent Policies (such as whole life, universal life, variable universal life and variable life policies); (ii) Disability Income Policies that have a Delayed Cover-

age Claim; and/or (iii) Term Life Policies that have a Delayed Coverage and/or Juvenile Smoker Claim, with a few exceptions that are listed in the Settlement Agreement at § II.A.17. The Class description (including identification of the individuals and entities who are specifically excluded from the Class) is set out in the Settlement Agreement and the Court's Final Order Approving Class Action Settlement.

The Complaint asserts ten causes of action, including violations of 18 U.S.C. § 1961 *et seq.* (Racketeer Influenced and Corrupt Organizations Act ("RICO")), breach of express and implied contract, common law fraud, fraudulent inducement, breach of fiduciary duty, negligence, negligent misrepresentation, unjust enrichment and imposition of a constructive trust, and reformation. The Complaint seeks compensatory, statutory and punitive damages, attorneys' fees and costs and prejudgment interest. (Compl. at 113). Plaintiffs also seek rescission, injunctive relief, reformation and other equitable relief. (*Id.*).

Plaintiffs' Complaint alleges improper practices in marketing, selling, servicing and administering permanent and term life insurance as well as disability income insurance policies by MassMutual during the Class Period. The specific practices alleged in the Plaintiffs' Complaint include, among other things, that:

(a) MassMutual engaged in a scheme of misrepresenting to policyholders that their premiums would "vanish" after a specified amount of out-of-pocket premiums had been paid (the "Vanishing Premium Claims") (Compl. at ¶¶ 1–7, 49–73);

(b) MassMutual engaged in a scheme of misrepresenting to policyholders that non-guaranteed components of the Permanent Policies, such as cash values and account values, would likely not change over time from the amounts depicted on sales illustrations or presentations (the "Performance Claims") (*Id.*);

---

7. Although Connecticut Mutual Life Insurance Company and its subsidiary C.M. Life Insurance Company merged into Massachusetts Mutual Life Insurance Company on or about March 1, 1996, this Settlement includes policies issued by all four companies. Thus, they are referred to as MassMutual as a whole.

(c) MassMutual engaged in improper and systematic "churning" activities to sell replacement policies to existing permanent life insurance policyholders (the "Replacement Claims") (Compl. at ¶¶ 8–18, 74–117);

(d) MassMutual charged premiums for periods of non-existent coverage with respect to Permanent, Term Life and Disability Income Policies (the "Delayed Coverage Claims") (Compl. at ¶¶ 19–20, 118–123);

(e) MassMutual induced policyholders to purchase permanent life insurance products by misrepresenting them as investment, retirement, college funding or savings plans (the "Retirement/Investment Plan Claims") (Compl. at ¶¶ 21–22, 124–131); and

(f) MassMutual priced policies issued to juveniles based upon substandard smoker rates even though the insureds were non-smoking infants and children at the time the policies were issued (the "Juvenile Smoker Claims") (Compl. at ¶¶ 23–28, 132–155).

Although MassMutual has agreed to settle the claims asserted in this action, MassMutual does not concede that it engaged in any wrongful conduct and denies all of the Plaintiffs' allegations. MassMutual considers it desirable to settle this case because the Settlement will: "(i) provide substantial benefits to MassMutual's present and former policyholders; and (ii) avoid the substantial expense, burdens and uncertainties associated with continued litigation of Plaintiffs' claims." (Def. Settle. Mem. at 5).

## D. The Parties and Their Counsel

### 1. The Class Representatives

Plaintiff Paul Varacallo is a citizen and resident of the State of New Jersey. (Compl. at ¶ 35). Varacallo is a policy owner of multiple MassMutual life insurance policies, including a Convertible Whole Life policy insuring his life, a Limited Whole Life policy insuring the life of his minor daughter Jaclyn E. Varacallo, and a Whole Life policy on his minor daughter Lisa F. Varacallo. (*Id.*).

Plaintiff Steven E. Feldman is a citizen and resident of the State of California. (Compl. at ¶ 39). Feldman owns a Graded Premium Life–20 insurance policy with a separate PUA rider insuring the life of his mother, June Feldman. (*Id.*).

Plaintiff K. Werner Gass is a citizen and resident of the State of Ohio. (Compl. at ¶ 40). Gass is the owner and insured of a Whole Life policy. (*Id.*).

Plaintiff Jeremiah B. Walsh is a citizen and resident of the State of New Jersey. (Compl. at ¶ 41). Walsh is the owner and insured of a Whole Life policy. (*Id.*).

Plaintiff William A. Karges, Jr. is a citizen and resident of the State of California. (Compl. at ¶ 36). Karges is a policy owner of a Survivorship Whole Life policy and a Modified Premium Whole Life policy. (*Id.*).

Plaintiff Jeffrey M. Weiner, as Trustee of the Karges Irrevocable Trusts I and II, is a citizen and resident of the State of California. (Compl. at ¶ 38). The Karges Irrevocable Trusts I and II were established by Plaintiff Karges and his spouse, Merrily D. Karges, for the purpose of, among other things, holding beneficial interest in life insurance policies on Karges' life in trust for their children. (Compl. at ¶ 37).

Plaintiff Donald A. Wofford is a citizen and resident of the State of California. (Compl. at ¶ 42). Wofford is the owner of a Whole Life Policy with Premiums Payable to Age 65, insuring the life of his son, Michael Wofford, who was five months old at the time the policy was issued. (*Id.*).

### 2. Class Counsel

The Class Representatives and the Class are represented by the law firms of Bonnett, Fairbourn, Friedman & Balint, P.C., Finkelstein and Krinsk, LLP, Lite DePalma Greenberg & Rivas, LLC, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Specter Specter Evans & Manogue, P.C., and Milberg Weiss Bershad & Schulman LLP. All are experienced and skilled class action counsel with expertise in insurance sales practices cases. (*See* Friedman Decl. at 57). Indeed, Class Counsel are responsible for other similar settlements and significant legal decisions including, but not limited to, *In re The Prudential Insurance Company of America Sales Practices Litigation ("Prudential I")*,

962 F.Supp. 450 (D.N.J.1997), *aff'd*, 148 F.3d 283 (3d Cir.1998) ("*Prudential II*"), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54 (D.Mass.1997); and *Willson v. New York Life Ins. Co.*, 1995 N.Y. Misc. LEXIS 652 (N.Y.Sup.Ct. Nov. 8, 1995), that set precedent and enable litigation such as this to be successfully prosecuted. (*See* Friedman Decl. at 57).

### 3. The Defendants

Plaintiffs' Class Action Complaint names Massachusetts Mutual Life Insurance Company, Connecticut Mutual Life Insurance Company, C.M. Life Insurance Company, and MML Bay State Life Insurance Company (hereinafter "Defendants" or "MassMutual") as Defendants.

Defendant Massachusetts Mutual Life Insurance Company,[8] individually and as surviving company pursuant to the merger between itself and Connecticut Mutual Life Insurance Company and C.M. Life Insurance Company, is a mutual life insurance corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business in Massachusetts. (Compl. at ¶ 44).

Defendant MML Bay State Life Insurance Company is a life insurance corporation organized under the laws of the State of Connecticut with its principal place of business in Massachusetts. (Compl. at ¶ 45). This Defendant is a subsidiary of Defendant Massachusetts Mutual Life Insurance Company. (*Id.*).

Defendant Connecticut Mutual Life Insurance Company was, prior to the merger, a mutual life insurance corporation incorporated under the laws of the State of Connecticut with its principal place of business in Connecticut. (Compl. at ¶ 46).

Defendant C.M. Life Insurance Company was, prior to the merger, a life insurance corporation incorporated under the laws of the State of Connecticut with its principal place of business in Connecticut. (Compl. at ¶ 47). This Defendant was a subsidiary of Defendant Connecticut Mutual Life Insurance Company. (*Id.*).

On or about March 1, 1996, Massachusetts Mutual Life Insurance Company merged with Connecticut Mutual Life Insurance Company and assumed control over Connecticut Mutual's business operations and liabilities. (Compl. at ¶ 48).

### 4. Defendants' Counsel

The Defendants are represented in this Settlement by the law firm of Edwards & Angell, LLP. This firm has extensive experience in the defense of complex and class action litigation.

### E. The Settlement

This Settlement Class Action arose following the coordination of this Class Counsel, that represented the Plaintiffs in *Varacallo, Karges, Russo, Gass,* and *Wofford,* in discussing the prospects for the settlement of the pending actions. (Friedman Decl. at 39). During the early discussions, beginning around April of 2003, counsel for MassMutual stressed that any class settlement would need to settle all claims by policyholders, nationwide, against all of MassMutual. (*Id.* at 40). MassMutual was not interested in discussing piecemeal settlements, rather all negotiations were to be global. (*Id.*). In addition, counsel for MassMutual expressed

---

**8.** On MassMutual's website, its organizational structure is explained as the following:

As a mutual company, we are owned by our members-our customers-rather than by stockholders. This type of corporate structure enhances our independence and agility, two qualities of great significance under current conditions. We can afford to think long term, without being overly focused on short-term results.

We strongly believe that, at least for the present, retaining our mutual form of ownership best serves our customers. Conversion to public ownership remains a future option, but for now would prove expensive and time-consuming. Our attention and resources remain focused on our core mission, which is serving our customers-not just at one moment in time-but over the lifetime of their relationship with us.

MassMutual Organizational Structure, *available at* http://www .massmutual.com/mmfg/about/customers/orgstructure.html (# 040768–000 May 2004) (footnote omitted).

that any such settlement would need to be comparable to the other nationwide class settlements that had been negotiated with other large insurance companies and that had been uniformly approved by the courts across the country. (*Id.*).

Under those circumstances, counsel for the parties began intensive settlement negotiations, which nearly fell apart at the outset. (*Id.* at 41). Nevertheless, talks continued, both face to face and by telephone. (*Id.*). Throughout these negotiations, the parties consulted with actuarial and other experts to ensure that counsel were fully informed on all financial and actuarial aspects of the settlement's proposed terms. (*Id.*). In addition, MassMutual made available to Class Counsel hundreds of thousands of additional documents that had not previously been obtained during discovery. (*Id.*). Class Counsel also interviewed several former employees of ConnMutual. (*Id.*).

Since Class Counsel had been involved in many other insurance sales practices cases against other companies, such as *Prudential,* which resulted in class action settlements, Class Counsel suggested applying those structural models to the proposed settlement with MassMutual. (Friedman Decl. at 43). MassMutual, however, had studied other insurance sales practices settlements and sought to have features of those settlements that would be most favorable to itself applied in its settlement terms. (*Id.*).

The Settlement that is before the Court is the product of about twelve months of lengthy and difficult negotiations, which resulted in an agreement on the terms of a settlement of all sales practices claims against MassMutual on a nationwide basis that Class Counsel concluded was very favorable to Class Members. (*Id.* at 44). Since the settlement would be a nationwide resolution of all insurance sales practices claims against MassMutual and its family of companies, the parties decided to file a new action in federal court. (*Id.* at 47). New Jersey was selected as the proper forum since *Varacallo,* being the closest to trial, was pending in New Jersey state court. (*Id.*). Furthermore, the District of New Jersey had seen

other successful insurance sales practices settlements, such as *Prudential I* and *Roy v. Independent Order of Foresters,* Civil Action No. 97–6225 (D.N.J. Aug. 3, 1999), on which the MassMutual settlement was modeled. (*Id.*).

The federal Complaint was filed in this Court on or about June 10, 2004. On or about June 23, 2004, counsel for the parties appeared before this Court seeking preliminary approval of the Proposed Settlement. On that date, the parties jointly submitted the Settlement Agreement to this Court.

The Complaint generally describes the Settlement Class (the "Class") as:

> all persons in the United States who own or owned MassMutual or Conn Mutual permanent life insurance policies issued from January 1, 1983 through December 31, 2003 and who are victims of any one or more of the following deceptive practices of MassMutual or Conn Mutual: (1) the Vanishing Premium Schemes; (2) the Performance Schemes; (3) the Replacement Sales Presentation Schemes; (4) the Replacement Policy Schemes; (5) the Delayed Coverage Schemes; (6) the Retirement/Investment Plan Schemes; and/or (7) the Juvenile Policy Smoker Rate Schemes. .... all persons who, from January 1, 1983 through December 31, 2003, purchased term life insurance policies or disability insurance policies from MassMutual or Conn Mutual, and who were damaged by the Delayed Coverage Schemes .... all persons who, from January 1, 1983 through December 31, 2003, purchased a life insurance policy from MassMutual or Conn Mutual that is either dividend-paying or has a cost of insurance, and who were damaged by the Juvenile Policy Smoker Rate Schemes.

(Compl. at ¶ 216).

The Final Order being executed contemporaneously with this Opinion specifically sets forth that the Class

> consists of all persons or entities who or which, has/have as of the Eligibility Date,[9] or who had at the time of the Policy's

9. "Eligibility Date" means March 31, 2004. (S.A. at 12).

termination (where termination occurs prior to the Eligibility Date), or who had at the time of the Policy's absolute assignment to an insurance company under Internal Revenue Code § 1035 (where assignment occurs prior to the Eligibility Date), an ownership interest in a Policy issued during the Class Period,[10] except "Class" or "Class Member" does not include a person(s) or entity(ies) (unless and to the extent the person or entity is a Class Member by virtue of an ownership interest in another Policy) (a) who has or had an ownership interest in a Policy that (i) was terminated on or before the Eligibility Date due to the death of the insured and MassMutual has or will pay a death benefit prior to the Implementation Date, (ii) was issued, but not accepted or was returned to the Company as part of the exercise of the free look provision in the Policy, or (iii) was rescinded and premiums were returned to the Policy owner as part of the reissue of a new Policy, or because of a misrepresentation by the Applicant on a Policy application; (b) who, while represented by counsel, signed a document that released MassMutual from any further Claims concerning the Policy; (c) whose rights and claims respecting the Policy have been finally adjudicated in a court of law; (d) who is or was a member of the Board of Directors and/or officer of Mass-Mutual during the Class Period; (e) who made a valid election to be excluded from the Class pursuant to the Preliminary Approval Order; (f) who is an insurance company that has or had an ownership interest in the Policy pursuant to an absolute assignment effected as part of an Internal Revenue Code § 1035 exchange; (g) who owns or owned Disability Income Policies, except to the extent they have a Delayed Coverage Claim and then only for such Delayed Coverage Claim; or (h) who owns or owned Term Life Policies, except to the extent they have a Delayed Coverage Claim and/or a Juvenile Smoker Claim and

then only for such Delayed Coverage Claim and/or Juvenile Smoker Claim.

(Final Order at 3–5) (footnotes added).

### F. The Preliminary Approval Order

The Court entered an Order dated June 24, 2004 (the "Preliminary Approval Order") preliminarily certifying the putative class in this action for settlement purposes under Fed.R.Civ.P. 23(a), 23(b)(2) and (b)(3), ordering individual and publication notice to potential Class Members, scheduling a Fairness Hearing for November 22, 2004, providing potential Class Members with an opportunity either to exclude themselves from the settlement class or to object to the Proposed Settlement and issuing related orders. The Order also enjoined Class Members from pursuing related litigation elsewhere unless they timely excluded themselves from the Class.

### G. The Fairness Hearing

Prior to the date scheduled for the Fairness Hearing, the parties filed comprehensive memoranda, declarations, affidavits and reports with the Court.

(a) Plaintiffs presented declarations and affidavits from: Andrew S. Friedman (Class Counsel and a member of the law firm of Bonnett, Fairbourn, Friedman & Balint, P.C.); Terry M. Long (Senior Vice President and Principal of Lewis & Ellis, Inc., an actuarial consulting firm); and Bruce D. Greenberg (Class Counsel and a member of the law firm of Lite DePalma Greenberg & Rivas, LLC). (Docket Entry # 114 & 117).

(b) Defendants submitted declarations and affidavits from: Godfrey Perrott (associated with the firm of Milliman, Inc., an actuarial firm consulting in the field of life insurance); Jeanne C. Finegan (President of Capabiliti, LLC, a national communications consulting and public relations firm); Richard H. Redfern (President of Rust Consulting, Inc., providing notification and/or claims administration services in class actions); Nicole F.J. Hamann (Director of Legal Services with Poorman–Douglas Corporation, specializing

---

**10.** "Class Period" means the period from January 1, 1983 though December 31, 2003. (S.A. at 10).

in settlement administration); and Katherine A. Plante (associate with the law firm of Edwards and Angell, LLP). (Docket Entry # 116).

(c) The parties also submitted briefs responding to the objections submitted by Class Members regarding the Settlement. (Docket Entry # 123, 124, 125, 151, 152).

On November 22, 2004, the Court held the Fairness Hearing to determine whether to grant final approval to the Proposed Settlement. Counsel for the Class and counsel for the Defendants gave presentations in support of granting class certification; approval of the Settlement Agreement; and approval of Class Counsel's request for an award of attorneys fees, reimbursement of expenses to Class Counsel, and for incentive awards to Representative Plaintiffs. The Court also heard from nine lawyers representing a total of twenty-six objectors. In addition, the Court heard from five objectors [11] appearing *pro se*, who gave short statements in opposition to the Proposed Settlement. In all, there were less than 100 class members who filed written objections,[12] amounting to about .003% of the policies covered by the Settlement Agreement. These objections are discussed below. To the extent the Court has not addressed a particular argument, it is because the Court agrees with the positions taken by Class Counsel and Defendants' counsel in their submissions. As of the date of the Fairness Hearing, holders of 2,204 Class policies had requested to opt out of the class, which is about .06% of the covered policies.

## II. TERMS AND VALUE OF THE SETTLEMENT AGREEMENT

The Proposed Settlement before this Court applies to MassMutual policies issued between January 1, 1983 and December 31, 2003, subject to certain exclusions. (S.A. at 9, 10, 16) (definitions of "Class," "Class Period" and "Policy"). Under the Proposed Settlement, most of the Class has a choice between two types of monetary relief: Claim Review Process Relief ("CRP") and General Policy Relief ("GPR"). (S.A. at 20–21). Claims asserted by term or disability policyholders are limited and any other claims that they may have are not affected by this Settlement. Class Members with term life insurance policies can assert, and will only release, claims for Delayed Coverage and/or Juvenile Smoker allegations. (S.A. at 21). Class Members with disability income policies can assert, and will only release, Delayed Coverage claims. (*Id.*). Claims such as these, on term life or disability income policies can only be pursued through CRP. (*Id.*). In addition, MassMutual will provide prospective relief as to these claims. (S.A. at 37–38 & Ex. D1, D2, D3).

### A. Class Members with Permanent Policies are Entitled to Either General Policy Relief or Claim Review Relief

General Policy Relief, consisting of a Settlement Death Benefit ("SDB"), is provided automatically to Class Members with Permanent Policies who do not elect CRP (as well as those that receive a score of "1" in CRP). The SDB provides a new or additional payment upon the death of an insured in an amount and duration that depend on the age of the insured and the face amount of the policy at issue. (S.A. at 22–25). Class Members do not need to take any action to obtain the SDB. (*Id.*). They may however decide to relinquish this benefit and present a claim to the Claim Review Process.

Class Members with Permanent Policies that affirmatively elect to proceed with Claim

---

11. As was revealed during Michael Ginsburg's, a *pro se*, oral objection, Mr. Ginsburg had opted out of the class and did not have standing to object. Nevertheless, the Court gave Mr. Ginsburg an opportunity to speak.

12. As of the date of the Fairness Hearing, through their attorney, two Class Members, Daniel Roubein and Toiee Roubein, had withdrawn their objections that had been filed with the Court. (*See* Docket Entry # 86, Roubein Obj.; Docket Entry # 140, Roubein Notice of Withdrawal of Objection). In their Notice of Withdrawal, their counsel explained that after having reviewed the discovery in this case and the related cases, and after having reviewed similar class actions and settlements, he advised the Roubeins that "pursuant to Rule 23, the proposed settlement, while not perfect, is fair, reasonable and adequate." (*Id.*).

Review Relief will be able to submit Limited Premium Payment, Performance, Replacement, Retirement/Investment, Delayed Coverage and/or Juvenile Smoker Claims to the CRP and receive monetary relief in accordance with the nature and strength of the Claimant's claim. The relief will be determined by a neutral Claim Evaluator, as more fully described below, based upon objective criteria. In addition, for sales practices or administrative claims that do not fit into one of the defined categories, Class Members will enter the ADR process.

### B. Class Members with Term Life and/or Disability Income Policies May Submit Claims to the Claim Review Process

Class Members with Term Life and/or Disability Income Policies may submit any Delayed Coverage Claims to the CRP. Class Members with eligible Term Life Policies may submit any Juvenile Smoker Claims to the CRP. It is important to note that these claims on term life or disability income policies may be pursued only through CRP.

MassMutual will also provide prospective relief as to these issues. With regard to the Delayed Coverage Claims, MassMutual has agreed to provide written disclosures aimed at assuring that its policyholders clearly understand the Delayed Coverage issue. (S.A. at 37). As for the Juvenile Smoker Claims, MassMutual has agreed to change the dividend and cost of insurance treatment for current in-force and future juvenile policies upon attaining the age of majority. (*Id.* at 38). No other claims that term or disability policyholders may have are affected by this Settlement.

### C. The Claim Review Process

The Claim Review Process is designed to resolve the claims of Class Members who assert that they were somehow misled by MassMutual. The CRP provides that an experienced, neutral Claim Evaluator, who has been selected by Plaintiffs' counsel and approved by MassMutual and the Court, will individually evaluate claims and award appropriate relief. The Claim Evaluator will review (i) the statement(s) and materials sub-

mitted by the Class Member, (ii) materials in the Claim File that MassMutual will be required to assemble, and (iii) any statement or materials submitted by the sales agent. (*Id.* at 28–32). However, individual Class Members may be entitled to relief even if they are unable to prove damage or any misrepresentation.

In reviewing the file, the Claim Evaluator will use detailed scoring guidelines, that the parties have mutually negotiated, and assign the claim a score from "0" through "4." (*Id.*, Exh A, at 6–7). If more than one improper practice is alleged in the claim, the Claim Evaluator will score each improper practice and the Class Member will get relief based on the highest score. (*Id.* at 9). Claimants scoring a "4" will receive monetary relief as set forth in accordance with schedules negotiated by the parties' actuaries, that is intended to provide the Claimant with the full benefit of the original bargain. (*Id.* at 22, 25, 27, 29). Scores of "3" and "2" will respectively receive 65% and 45% of the amount awarded to scores of "4." (*Id.*). A score of "1" results in the Claimant receiving the alternative form of relief, GPR. (*Id.* at 22–30). A score of "0" receives no relief. (*Id.*).

Submissions of a Delayed Coverage Claim or Juvenile Smoker Claim entail a different process. With Delayed Coverage Claims, the Claim Evaluator will find such a claim, with certain exceptions, if there is evidence that the Class Member paid premiums for periods during which the Policy did not provide coverage. (*Id.* at 30–31). A Class Member with a valid claim will, in accordance with the Settlement Agreement, receive either a credit to their In–Force Policies or a cash payment if the Policies are Terminated. (*Id.* at 32–33).

As for Juvenile Smoker Claims, the Claim Evaluator will not find a valid claim where the Claimant or insured identified the insured as a smoker on the Claim Form or in writing to MassMutual, if MassMutual demonstrates that the insured was actually treated as a non-smoker, or if MassMutual submits documentation demonstrating that the insured was in fact a smoker. (*Id.* at 34). Any claimant with a valid Juvenile Smoker Claim will receive either a credit to their In–

Force Policies or a cash payment for Terminated Policies. (*Id.* at 35).

### D. The Release

The Settlement Agreement contains a release that generally bars Class Members from asserting other claims that were or could have been asserted against MassMutual in this case. The release and its exclusions were set forth in Section X of the Settlement Agreement and were reprinted in full as an Appendix to the Notice of Class Action.

### E. Value of the Relief

The Proposed Settlement offers significant value to the Class Members. Plaintiffs' actuarial expert, Terry M. Long of Lewis & Ellis, Inc., placed an estimated value of CRP and GPR at not less than $698.7 million. (Long Decl. at ¶ 15). This settlement valuation does not include the prospective relief awarded in connection with the Juvenile Smoker and Delayed Coverage Claims, nor the ADR process or other administrative expenses. (*Id.*). It also does not include the value to the Class of not having to pay the requested $58.2 million attorneys' fees and expenses, which will be paid directly by MassMutual. (*Id.*). Including that additional relief, the value to the Class is more likely in excess of $750 million.

Other than the cost of postage, it costs Class Members nothing to participate in the CRP. MassMutual will pay all of the costs for the CRP such as the Claim Evaluator, the CRP process itself, and a separate ADR process that is provided for claims that do not fall into one of the defined categories of claims.

MassMutual, however, is obligated to pay out at least $130 million up to a maximum of $165 million, which is subject to adjustment up to $180 million under certain circumstances, in Claim Review Relief. (S.A. at 36, 60–61). If the awards issued by the Claim Evaluator total less than the guaranteed minimum amount, the high scoring CRP Claimants will receive a *pro rata* increase in their relief awarded to them. (*Id.* at 36–37). Any awards paid out of the ADR process are

uncapped—there is no minimum or maximum.

Similar to CRP, there are no costs to Class Members for obtaining GPR and no paperwork needs to be submitted. GPR is a Supplemental Death Benefit that will increase the face value of the Claimant's insurance coverage for a specific period of time. (*Id.* at 22–24). The parties assert that this is free additional insurance. The GPR relief is estimated to be worth at least $568.7 million to the Class. (Long Decl. at ¶ 15).

### III. JURISDICTION

#### A. Subject–Matter Jurisdiction

This Court has federal subject-matter jurisdiction over all claims against MassMutual pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331, because Plaintiffs' Complaint alleges violations of federal law, specifically RICO, 18 U.S.C. § 1961 *et seq. See Prudential II*, 148 F.3d at 301. Moreover, the existence of federal question jurisdiction over the RICO claims authorizes this Court to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over the Plaintiffs' remaining state law claims. *Id.* at 303. Since the RICO claims and the state law claims all arise from the same "common nucleus of operative fact" (i.e., that Defendants allegedly employed unlawful sales practices based upon misrepresentations in order to sell insurance policies), this Court properly has supplemental jurisdiction to resolve them. *See id.*

In addition, as Plaintiffs contend, this Court also possesses diversity jurisdiction under 28 U.S.C. § 1332. (Compl. at ¶¶ 32–33). Complete diversity exists between each named Plaintiff and the Defendants, and each named Plaintiff has pleaded an amount in controversy of more than $75,000. (*Id.*). The named Plaintiffs and Defendants are citizens of different states. (*Id.* at ¶ 32). Also, Plaintiffs allege that each named Plaintiff's amount in controversy exceeds $75,000, "exclusive of interest and costs, by virtue of the combined loss of death benefit coverage, accumulated cash value, dividends, paid-up additional insurance, lifetime income and/or other non-forfeiture benefits," in addition to

the punitive damages and injunctive and equitable relief sought, in which each Class Member has an undivided interest.[13] (*Id.* at ¶ 33).

Since the named Plaintiffs' claims meet or exceed the amount in controversy requirement and no opposition has been received or any objections made, the Court finds that it also has subject-matter jurisdiction over Plaintiffs' claims by virtue of diversity jurisdiction.

Therefore, the Court has subject-matter jurisdiction over the claims asserted in the Complaint pursuant to 28 U.S.C. §§ 1331, 1332, and 1367, including, without limitation, jurisdiction to approve the Proposed Settlement and the Settlement Agreement and all exhibits attached thereto, grant final certification of the Class, and dismiss the Complaint on the merits and with prejudice.

### B. Personal Jurisdiction

This Court has personal jurisdiction over the Plaintiffs, who are parties to this action and have agreed to serve as Class Representatives, and Class Members from New Jersey because those persons have minimum contacts with this forum. This Court also has personal jurisdiction over all out-of-state Class Members because, as will be discussed in more detail below, the extensive Notice provided to Class Members, when combined with the opportunity to object and appear at the Fairness Hearing or to opt out, fully satisfies due process requirements for a Rule 23(b)(3) class. *See Prudential II*, 148 F.3d at 306 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)).

Because due, adequate and the best practicable notice has been disseminated and all potential Class Members have been given the opportunity to exclude themselves from or object to this class action settlement, the Court has personal jurisdiction over all Class Members. The Court therefore finds that all

Class Members who did not timely request exclusion from the Class by the October 24, 2004 deadline, or who failed to request exclusion as set out in the Court's Preliminary Approval Order dated June 24, 2004 and described in the notice, are subject to this Court's personal jurisdiction. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. at 812–13, 105 S.Ct. 2965.

### IV. NOTICE TO CLASS MEMBERS

In its Preliminary Approval Order (Docket Entry # 8), the Court found that the Class Notice Packages to be provided to Class Members, the procedures for mailing and re-mailing the Class Notice Packages, and the summary publication notice constituted "the best practicable notice" and were

> reasonably calculated, under the circumstances, to apprise the Class Members of the pendency of this Action, the terms of the proposed settlement, and their rights under the proposed settlement, including, but not limited to, their right to object or exclude themselves from the proposed settlement … [are] reasonable and constitute[ ] due, adequate and sufficient notice to all Class Members and other persons entitled to receive notice; and [ ] meet[ ] all applicable requirements of law, including but not limited to, Fed.R.Civ.P. 23(c) and the Due Process Clause(s) of the United States Constitution.

(Preliminary Approval Order at 9). In addition, the Court found that "all of the notices are written in simple terminology, are readily understandable by Class Members, and comply with the Federal Judicial Center's illustrative class action notices." (*Id.*). Based on the findings set forth below, the Court affirms these conclusions.

In this case, notice was a combined notice to inform Class Members of the existence of a class action and the existence and substance of the Proposed Settlement. Thus, the combined class notice must conform with both Rule 23(c)(2) and Rule 23(e). Rule

---

**13.** Nevertheless, although not at issue here, it appears that the Court would still be able to exercise supplemental jurisdiction over Class Plaintiffs' claims here that do not meet the amount in controversy requirement so long as one named Plaintiff satisfied the amount in controversy. *See Prudential I*, 962 F.Supp. at 503–04 (noting that *Zahn v. Internat'l Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) was effectively overruled by 28 U.S.C. § 1367). *But see Meritcare Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 220 (3d Cir.1999).

23(c)(2) requires that with classes certified under "23(b)(1) or (2) the court may direct appropriate notice to the class." Fed. R.Civ.P. 23(c)(2)(A). However, with classes certified under 23(b)(3), notice to the Class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2)(B). In addition, for classes certified under Rule 23(b)(3),

The notice must concisely and clearly state in plain, easily understood language:

- the nature of the action,

- the definition of the class certified,

- the class claims, issues, or defenses,

- that a class member may enter an appearance through counsel if the member so desires,

- that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded, and

- the binding effect of a class judgment on class members under Rule 23(c)(3).

Fed.R.Civ.P. 23(c)(2)(B).

Rule 23(e) requires that "notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed.R.Civ.P. 23(e). It is evident that the requirements of Rule 23(c)(2) are more rigorous than those of Rule 23(e). *See also Carlough v. Amchem Products, Inc.*, 158 F.R.D. 314, 324–25 (E.D.Pa.1993) ("The requirements of Rule 23(c)(2) are stricter than the requirements of Rule 23(e) and arguably stricter than the due process clause.").

■ "Notice of a proposed settlement under Rule 23(e) must inform class members (1) of the nature of the pending litigation, (2) of the settlement's general terms, (3) that complete information is available from the court files, and (4) that any class member may appear and be heard at the Fairness Hearing." *Prudential I*, 962 F.Supp. at 527 (citing 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions*, § 8.32, at 8–103 (3rd ed.1992) (hereinafter "*Newberg*")).

■ "The notice of the Proposed Settlement, to satisfy both Rule 23(e) requirements and constitutional due process protections, need only be reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections." *Prudential I*, 962 F.Supp. at 527 (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

As approved by the Court, approximately 3 million detailed Class Notice Packages were mailed by first-class, postage prepaid U.S. mail, to the last known address of each member of the Class. (*See* Affidavit of Nicole F.J. Hamann submitted with Motion for Final Approval ("Hamann Aff.") at ¶ 11, Docket Entry # 116). Other courts have held that this method of notification has been deemed "ideal." *Prudential I*, 962 F.Supp. at 527–28 (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir.1975)); *In re Chambers Dev. Sec. Litig.*, 912 F.Supp. 822, 836 (W.D.Pa.1995). Indeed, it is further significant that the Court has not received any objection challenging this mode of dissemination. As stated by Judge Wolin in the *Prudential* case, involving a practically identical mode of dissemination, "Dissemination of the Class Notice in this case has been extraordinary." *Prudential I*, 962 F.Supp. at 527.

These Class Notice Packages were mailed out between August 23, 2004 and September 7, 2004. (Hamann Aff. at ¶ 11). Any that were returned as undeliverable with no forwarding address were then researched using an address locator service so they could be re-mailed. (*Id.* at ¶ 13).

The Notice Package included, among other things (a) the case caption; (b) the definition of who is a Class Member; (c) identification of counsel for the Class; (d) the terms and benefits of the Settlement Agreement and how the Settlement would provide relief to the Class Members; (e) the binding effect of any judgment on those persons who are Class Members; (f) information about the right of Class Members to request exclusion (i.e., opt out) from the Class and the procedures and deadlines for doing so; (g) the right of Class Members to object to any

aspect of the Settlement and the procedures and deadlines for filing objections to the Settlement; (h) the date, time, and location of the Fairness Hearing; (i) information about appearing at the Fairness Hearing and the deadlines for filing notice of an intent to appear; (j) how to obtain additional information, including the toll-free telephone number established to respond to Class Member inquiries; (k) the binding effect of the Settlement, if finally approved; and (*l*) the fees and expenses requested by Class Counsel, and incentive awards requested for Representative Plaintiffs.

The Notice Package provided to Class Members contains clear and comprehensive documents that the Court finds are written in simple terminology, and are readily understandable by Class Members. Moreover, the Notice Package in this case parallel that approved by the Third Circuit in *Prudential II*. There the court held that "the provision of individual notice to each class member is by no means typical of the notice provided in most class actions, and certainly qualifies as unprecedented." *Prudential II*, 148 F.3d at 306.

In addition to providing the individual notice described about, the Notice Administrator published a Summary Settlement Notice in numerous leading nationwide newspapers and magazines from August 30, 2004 through September 6, 2004. (Affidavit of Jeanne C. Finegan submitted with Joint Motion for Final Approval ("Finegan Aff.") at ¶ 6.4, Docket Entry # 116 at ¶ 6.4). By working with a nationally syndicated media research firm, the Notice Administrator was able to define a target audience for the MassMutual Class Members which provided a valid basis for determining the magazine and newspaper preferences of the Class Members. (*Id.* at ¶ 5.2). The Summary Notice ran for two consecutive weeks in *Parade Magazine* and *USA Weekend,* two major newspaper inserts. (*Id.* at ¶ 6.4). In addition, it was published twice in *People, Time* and *Newsweek,* and one time in *Fortune, Business Week,* the *Wall Street Journal* and the *New York Times.* (*Id.*). The combined circulation of these publications is 76,114,970 reaching an approximate audience of 223,427,175 readers.

(*Id.*). It has been reported to the Court that the publication notice program reached an estimated 92.48 percent of the Class, with an estimated average frequency of exposure of 3.09 times. (*Id.* at ¶ 6.1). The Court agrees with Class Counsel that this was more than adequate. *See, e.g., In re American Family Ent.,* 256 B.R. 377, 417 (D.N.J.2000) (finding notice sufficient and citing a comparable affidavit).

The Summary Notice included, among other things, (a) a plain and concise description of the nature of the Action; (b) the definition of the Class; (c) the terms of the Proposed Settlement, including information on the proposed relief and what claims would be released; (d) the dates and deadlines for Class Members to exercise their right to opt out of the Class; (e) the dates and deadlines for Class Members to exercise their right to object at the Fairness Hearing; (f) the date of the Fairness Hearing; (g) a toll-free number and address where Class Members could obtain additional information; and (h) the fees and expenses requested by Class Counsel and the awards requested for the Class Representatives.

The Claims Administrator also established three toll-free telephone numbers, at a telephone center (the "Call Center") in Minneapolis, Minnesota, which answered close to 80,000 calls. (Affidavit of Richard H. Redfern submitted with Joint Motion for Final Approval ("Redfern Aff.") at ¶ 23, Docket Entry # 116). The Call Center opened on August 23, 2004, and will continue operating until the CRP process is complete. (*Id.*). Three separate numbers were established for policyholders, the hearing impaired, and MassMutual agents. (*Id.* at ¶ 11). These toll-free telephone lines are staffed by trained telephone representatives and supervisors to provide Class Members and the general public with information about the Settlement. (*Id.* at ¶¶ 12–13). In instances where the representative can not fully answer a question, Class Counsel is available to speak directly with Class Members. (*Id.* at ¶ 19).

The Court is not persuaded by the objec-

tions[14] raised as to the timeliness of the notice. (*See, e.g.*, Wolfson Obj., Docket Entry # 94; Baulch Obj., Docket Entry # 100; Daley Obj., Docket Entry # 102; Basil Obj., Docket Entry # 105; Miller Obj., Docket Entry # 113; Holthaus Obj., Docket Entry # 115). These objections generally contend that they lacked sufficient time to decide what to do. However, the overwhelming majority received their Notices with more than sufficient time to review the Notice, call the toll-free number or Class Counsel for more information, and/or even to consult with counsel. With the exception of the Notices that needed to be re-mailed, the vast majority of the Class Members received their Notices within 45 to 60 days before any of the deadlines, and about three months before the Fairness Hearing. It has been held that notice mailed even one month before any of the deadlines was still timely. *See, e.g., Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir.1993) (finding notice mailed 31 days prior to deadline for submitting objections timely); *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir.1977) (notice mailed 26 days before deadline for opting out was adequate). Even for those did not receive a Class Notice Package, the Summary Notice, that was published in leading newspapers and magazines, was estimated to have reached 92.48% of the Class, with an estimated frequency of 3.09 times. Nevertheless, Rule 23 only requires the "best possible notice under the circumstances." It does not require perfect notice.

The Court is likewise unpersuaded by the objections raised as to the adequacy of the notice. (*See, e.g.*, Gupta Obj., Docket Entry # 25; Gambello Obj., Docket Entry # 85;Koppell Obj., Docket Entry # 88, 89; Izes Obj., Docket Entry # 90; Smith Obj., Docket Entry # 97, 98;Yoes Obj., Docket Entry # 106; Basil Obj., Docket Entry # 105; Corcoran Obj., Plante Aff. Ex. 22). The Class Notice Packages informed, as clearly and as concisely as possible, the Class Members of the nature of the litigation, the terms of the Settlement Agreement and all other requirements. The content of the No-

tices were scrupulously reviewed and approved by this Court, in its Preliminary Approval Order, and were based on models approved by courts in other insurance sales practices settlements. Class Members were given the opportunity to exclude themselves from the Class and pursue their own litigation. A notice, such as the one used here, is "designed only to be a summary of the litigation and the settlement" and should not be "unduly specific." 2 *Newberg* § 8.32.

As to the objections that the Notices provided insufficient information about the Claim Review Process, the Court finds them unfounded. (*See, e.g.*, Sealy Obj., Docket Entry # 75; Gambello Obj., Docket Entry # 85; Wilensky Obj., Docket Entry # 75; Yoes Obj., Docket Entry # 106). Any Class Member who wanted more specific information could have called the Information Center or Class Counsel, or reviewed the Settlement Agreement itself. The Claim Review Process is based on each Class Member's individual circumstances and every contingency could not possibly be summarized in any Notice. Had such been done, the Notice would most certainly have been too long and complex.

In addition, objections to the Notice containing a slightly different Class definition from that in this Court's Preliminary Approval Order are also overruled. (*See* Sealy Obj., Docket Entry # 75). The Court agrees with Class Counsel and finds that it was a technical error and that what is critical is that the Class Notice had the correct definition—because that is what Class Members were sent. (*See* Tr. at 123–24). The Class definition in the Notice was in fact the correct definition and it conformed with the definition in the Proposed Settlement Agreement. The fact that the Preliminary Approval Order omitted a couple of terms is not significant because the Proposed Settlement Agreement and Class Notice contained the correct Class definition.

■ Based upon its review of the individual and publication notice materials, and ex-

---

14. Throughout this Opinion, the Court has not attempted to discuss every objection or issue raised in the objections, and to the extent the

Court has not done so, it is because the Court agrees with the positions taken by Class Counsel and Defendants in their submissions.

pert testimony concerning those materials, and having considered the objections of Class Members, the Court concludes that the Class Notice Packages and their dissemination to the Class and all other notices, the publication of the Summary Settlement Notice and notice methodology implemented pursuant to the Settlement Agreement and this Court's Preliminary Approval Order, (a) constituted the best practicable notice to Class Members under the circumstances of this Action; (b) constituted notice that was reasonably calculated, under the circumstances, to apprise Class Members of (i) the pendency of this action; (ii) the terms of the Proposed Settlement; (iii) their rights under the Proposed Settlement; (iv) their right to exclude themselves from the Class and the Proposed Settlement; (v) their right to object to any aspect of the Proposed Settlement (including final certification of the settlement class, the fairness, reasonableness or adequacy of the Proposed Settlement, the adequacy of the Class's representation by Plaintiffs or Class Counsel and/or the award of attorneys' fees); (vi) their right to appear at the Fairness Hearing—either on their own or through counsel hired at their own expense—if they did not exclude themselves from the Class, and (vii) the binding effect of the Orders and Judgment in this action, whether favorable or unfavorable, on all persons who did not request exclusion from the Class; (c) constituted notice that was reasonable, due, adequate and sufficient notice to all persons and entities entitled to be provided with notice; and (d) constituted notice that met all applicable requirements of the Federal Rules of Civil Procedure and the Due Process Clause of the United States Constitution and any other applicable law, as well as complying with the Federal Judicial Center's illustrative class action notices. All objections submitted with regard to Notice are hereby overruled.

The Court thus affirms its finding and conclusion in the June 24, 2004 Preliminary Approval Order that the notice in this case meets the requirements of the Federal Rules of Civil Procedure and the Due Process Clause of the United States and/or any other applicable law, as well as complying with the Federal Judicial Center's illustrative class action notices.

## V. CLASS CERTIFICATION

Through the Preliminary Approval Order, this Court preliminarily certified this Class for settlement purposes. "Class actions created for the purpose of settlement are well recognized under Rule 23 of the Federal Rules of Civil Procedure." *In re Lucent Techs., Inc. Sec. Litig.* ("*Lucent I*"), 307 F.Supp.2d 633, 639–40 (D.N.J.2004) (citing *Prudential I*, 962 F.Supp. 450). The Court now turns to an analysis of whether class certification remains appropriate for this matter.

Class certification "enables courts to treat common claims together, obviating the need for repeated adjudications of the same issues." *General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.* ("*GM Trucks*"), 55 F.3d 768, 783 (3d Cir.), *cert. denied*, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). "Courts increasingly have used the class action device in cases, such as this one, in which a class of policyholders has sued an insurance company for misrepresentations in the sale of insurance policies and benefit plans." *Prudential I*, 962 F.Supp. at 507 (citing *Reserve Life Ins. Co. v. Kirkland*, 917 S.W.2d 836 (Tex.App. 1996); *Janicik v. Prudential Ins. Co. of America*, 305 Pa.Super. 120, 451 A.2d 451 (1982)).

Rule 23 of the Federal Rules of Civil Procedure allows the Court to certify a class for settlement purposes only. *Prudential I*, 962 F.Supp. at 508. A settlement class is "a device whereby the court postpones the formal certification procedure until the parties have successfully negotiated a settlement, thus allowing a defendant to explore settlement without conceding any of its arguments against certification." *GM Trucks*, 55 F.3d at 786. "In certifying a class for settlement purposes, the Court must abide by the ordinary Rule 23 requirements...." *Prudential I*, 962 F.Supp. at 508; *see also GM Trucks*, 55 F.3d at 778 (holding that Rule 23(a) requirements must be satisfied as if class were to litigate its claims). "Thus, a settlement class must satisfy the Rule 23(a) requirements of numerosity, com-

monality, typicality, and adequacy of representation and the Rule 23(b) requirements." *Prudential I,* 962 F.Supp. at 508. In addition, because the settlement proponents in this case seek to certify the class under Rule 23(b)(3), the class must also satisfy this provision's superiority and predominance standards. *See id.*

■■■ Further, in a settlement class action, the "Court must consider the propriety of certification as if the case were to go to trial." *Prudential I,* 962 F.Supp. at 508. It is the rule in this Circuit "that settlement class certification is not permissible unless the case would have been 'triable in class form.'" *Id.* (quoting *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 625 (3d Cir. 1996)). Here, for example, two courts (the Superior Courts in New Jersey and California) have certified both *Varacallo* and *Karges* as class actions for trial purposes. (*See* Friedman Decl. at ¶¶ 23–24, 72–74 (discussing *Varacallo, et al. v. Massachusetts Mut. Life Ins. Co.,* No. ESX–L–3403–97 (Superior Ct., Law Div., Essex County, N.J.) and *Karges, et al. v. Massachusetts Mut. Life Ins. Co.,* No. GIC–713920 (Superior Ct., San Diego County, Cal.))).

The Court received one objection that asserted that this Court is precluded on *res judicata* grounds from granting certification to this nation-wide class. (*See, e.g.,* Wolfson Obj., Docket Entry # 94). Citing to *Markarian v. Connecticut Mutual Life Ins. Co.,* 202 F.R.D. 60 (D.Mass.2001) and *Cohn v. Mass-Mutual,* 189 F.R.D. 209 (D.Conn.1999), Wolfson contends that the decisions made by these two other federal courts in denying class certification preclude class certification here. (*Id.*). Although that is an interesting position, it is contrary to the law and facts. Those cases did not involve settlement class certification and they alleged sales tactics that were orchestrated by the sales agents themselves as opposed to a "top down" scheme involving written illustrations and other sales materials as is alleged here. *See Snell v. Allianz Life Ins. Co. of North Amer-*

*ica,* 2000 WL 1336640, at *13, 2000 U.S. Dist. LEXIS, at *43 (D.Minn. Sept. 8, 2000) ("Both of those cases, however, considered the issue in a different context, as neither Court was confronted with a settlement proposal...."). Furthermore, denials of class certification are without prejudice and likely would not have a *res judicata* effect on this Court because a new motion for class certification could be asserted. *See, e.g., In re Ford Motor Co. Ignition Switch Litig.,* 174 F.R.D. 332, 356 (D.N.J.1997) (stating that if the parties can cure the noted shortcomings they could reapply for the appropriate class certification). Therefore, the Court overrules this objection.

■■■ The Court is required to spell out its findings of fact so as to establish each of the Rule 23 requisites.[15] *See Prudential I,* 962 F.Supp. at 508. "In a borderline case, the Court should allow class certification: 'the interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action.'" *Id.* (quoting *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.) (citations omitted), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 343, 88 L.Ed.2d 290 (1985)). For the following reasons, this Court finds that class certification remains appropriate.

### A. Numerosity

■■■ Rule 23(a)(1) provides that the proposed class must consist of members that are so "numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Notwithstanding, "'[i]mpracticability' does not mean 'impossibility.'" *Lucent I,* 307 F.Supp.2d at 640. "To meet the numerosity requirement, class representatives must demonstrate only that 'common sense' suggests that it would be difficult or inconvenient to join all class members." *Prudential I,* 962 F.Supp. at 510 (citing *Lerch v. Citizens First Bancorp, Inc.,* 144 F.R.D. 247, 250 (D.N.J.1992)).

When dealing with a large class, that numbers in the hundreds, joinder will be imprac-

---

**15.** Even though the Court considers the propriety of class certification as if the case were going to trial, the manageability prong of Rule 23(b)(3)(D) is not applicable in settlement-only class certifications and need not be discussed. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

ticable. *Id.* (quoting 1 *Newberg* § 3.05, at 3–25) (stating that a number less than one hundred will usually satisfy the numerosity requirement of Rule 23(a)(1)). Here, joinder of all Class Members is impracticable because there are nearly 3,000,000 Class Members. Rule 23(a)(1) is therefore satisfied.[16]

## B. Commonality and Predominance

It is customary in Rule 23(b)(3) class actions for courts to jointly apply the Rule 23(a)(2) commonality requirement and the Rule 23(b)(3) predominance tests. *Prudential I*, 962 F.Supp. at 510 (citing 1 *Newberg* § 3.13, at 3–71). This approach has been approved by the Third Circuit. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir.2004) ("the Rule 23(b)(3) predominance requirement, which is far more demanding, incorporates the Rule 23(a) commonality requirement.... Accordingly, we analyze the two factors together ...." (citations omitted)); *Georgine*, 83 F.3d 610 at 626.

■ Another prerequisite to a class action is that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "This requirement is satisfied 'if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'" *Prudential I*, 962 F.Supp. at 510 (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994) (citation omitted)). Here, the commonality requirement is met because there are many common questions, including the following that are listed in the Complaint:

(a) whether MassMutual and Conn Mutual, through their agents, engaged in uniform deceptive acts and practices, whether by omission or commission;

(b) whether MassMutual and Conn Mutual, through their agents, misrepresented to or concealed from the Class material information concerning the financing of life insurance policies;

(c) whether MassMutual and Conn Mutual, through their agents, misrepresented to or concealed from the Class the current and/or future value of life insurance policies;

(d) whether MassMutual and Conn Mutual placed new and existing policyholders at an undisclosed, increased and unnecessary economic risk by selling them life insurance policies upon the false and misleading uniform sales presentations;

(e) whether the uniform sales presentations, policy illustrations and related materials, described in the Complaint, contained false or misleading facts or omitted material facts;

(f) whether MassMutual, Conn Mutual and their agents developed, encouraged and engaged in a scheme or schemes to sell life insurance policies upon false and misleading uniform sales presentations, policy illustrations and related materials as described in the Complaint;

(g) whether MassMutual and Conn Mutual created and supplied their agents with flawed computer programs employing artificially inflated dividend scales and/or interest rates with the instruction that they use them to generate false and misleading uniform sales presentations, policy illustrations and related materials with which to sell life insurance policies;

(h) whether MassMutual and Conn Mutual instructed, encouraged or permitted their agents to mismark or otherwise improperly complete policy applications and related documents;

(i) whether MassMutual and Conn Mutual misrepresented, concealed or failed to disclose that dividend scales and interest rates used to illustrate policy performance in the uniform false and misleading sales presentations, policy illustrations and related materials were artificially inflated in excess of their then current experience and could not be maintained at illustrated levels if conditions remained unchanged;

(j) whether MassMutual and Conn Mutual concealed or failed to disclose in the uniform false and misleading sales presentations, policy illustrations and related materials that they expected and/or, in fact, developed a plan to reduce dividend scales and interest rates used to illustrate policy performance in future policy years;

---

**16.** The Court did not receive any objections as to the numerosity requirement.

(k) whether MassMutual and Conn Mutual failed to supervise and train their nationwide sales force adequately with regard to the sale of life insurance policies;

(*l*) whether MassMutual and Conn Mutual encouraged or instructed their sales force to engage in any of the deceptive practices as described in the Complaint;

(m) whether MassMutual and Conn Mutual failed to maintain adequate internal controls to prevent, detect and/or deter the deceptive practices as described in the Complaint;

(n) whether MassMutual and Conn Mutual ignored or failed to properly respond to reports, whether internal or not, that their agents were engaging in the deceptive practices as described in the Complaint;

(o) whether MassMutual and Conn Mutual, through their agents, mischaracterized the suitability of life insurance products for certain purposes, such as funding a savings or investment plan;

(p) whether MassMutual delayed the effective date of coverage on permanent and term life insurance policies and disability insurance policies;

(q) whether MassMutual improperly payed lower dividends, collected higher costs of insurance charges, and charged higher premiums for policies initially issued on the lives of juvenile insureds based on smoker mortality tables when in fact the insureds did not smoke an did so without an adequate or appropriate actuarial basis; and

(r) whether MassMutual devised and deployed a scheme or artifice to defraud, or engaged in a common course of charging net premiums based on smoker mortality tables to non-smokers.

(Compl. at ¶ 222).

■ For a class that is certified under Rule 23(b)(3), which the parties are here seeking, the Court must find that these common questions predominate over individual issues. *Prudential I*, 962 F.Supp. at 510–11. "To evaluate predominance, the Court must determine whether the efficiencies gained by class resolution of the common issues are outweighed by individual issues presented for adjudication." *Id.* at 511 (citing 1 *Newberg* § 4.25, at 4–81 to 4–86). Courts have readily held that even a few common issues can satisfy this requirement where their resolution will significantly advance the litigation. *Id.* (gathering authority). For example, in cases where it is alleged that the defendant made similar misrepresentations, non-disclosures, or engaged in a common course of conduct, courts have found that conduct to satisfy the commonality and predominance requirements. *Id.* (gathering authority). Predominance has been found to not be met in cases that "required individualized proof of 'highly case-specific factual issues.' " *Elkins v. Equitable Life Ins. Co.*, 1998 WL 133741, at *16, 1998 U.S. Dist. LEXIS 1557, at *49 (M.D.Fla. Jan. 27, 1998) (quoting *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1004–05 (11th Cir.1997) (involving whether Motel 6 had a practice or policy of racial discrimination)); *see also Amchem*, 521 U.S. at 622, 117 S.Ct. 2231 (involving widely varying personal injuries as a result of different sorts of exposure to different types of asbestos products with current and future asbestos-related claims).

As is relevant to the case at hand, many courts have found predominance in similar nationwide insurance sales practices settlement cases. *See, e.g., Prudential II*, 148 F.3d at 314–15; *In re Metropolitan Life Ins. Co. Sales Practices Litig.*, 1999 U.S. Dist. LEXIS 22688, *64–68 (W.D.Pa. Dec. 28, 1999) ("*MetLife*"); *Manners v. Am. Gen'l Life Ins. Co.*, 1999 WL 33581944, *16, 17, 1999 U.S. Dist. LEXIS 22880, at *47–50 (M.D.Tenn. Aug. 10, 1999); *Bussie v. Allmerica Financial Corp.*, 50 F.Supp.2d 59, 71 (D.Mass.1999); *Elkins*, 1998 WL 133741, at *15–18, 1998 U.S. Dist. LEXIS 1557, at *46–55; *Duhaime*, 177 F.R.D. at 64.

■ Furthermore, as courts have frequently held, any potential choice of law issues do not outweigh the many other common issues so as to preclude a finding of predominance. *Prudential II*, 148 F.3d at 315; *MetLife*, 1999 U.S. Dist. LEXIS 22688, at *67; *Manners*, 1999 WL 33581944, at *17, 1999 U.S. Dist. LEXIS 22880, at *50; *Bussie*, 50 F.Supp.2d at 71; *Elkins*, 1998 WL 133741, at *17, 1998 U.S. Dist. LEXIS 1557,

at *51; *Duhaime,* 177 F.R.D. at 64. "At the certification stage, the Court need only determine which state law is 'likely' to apply" should this case be litigated. *Elkins,* 1998 WL 133741, at *17, 1998 U.S. Dist. LEXIS 1557, at *51. Here, the case is not being certified for litigation purposes, thus, as in *Prudential,* predominance is not defeated by any differences in the various laws of the fifty states. 148 F.3d at 315. The Third Circuit recently stated that "[i]n certifying a nationwide settlement class, the District Court was well within its discretion in determining that variations between the laws of different states were insufficient to defeat the requirements of Rule 23." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d at 530.

Here, the common factual and legal thread is an alleged nationwide scheme of uniform deceptive insurance sales practices that purportedly injured Defendants' policyholders. Considering all the allegations in the Complaint, the Court finds that common questions of fact and law predominate over any questions of law or fact affecting only individual members of the Class.[17]

### C. Typicality

▉ Rule 23 requires also that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). In essence, "[t]he typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Tel. Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). "Typicality lies where there is a strong similarity of legal theories or where the claims of the class representatives and the class members arise from the same alleged course of conduct by the defendant." *Prudential I,* 962 F.Supp. at 518 (citations omitted). Hence, even where there may be factual differences between the claims of the Class Representatives and other Class Members, it does not rule out a finding of typicality. *Lucent I,* 307 F.Supp.2d at 640 (citing *Prudential II,* 148 F.3d at 310). Therefore, the Court is not persuaded by the objection of Hildebrand in which he contends that the "claims of class

members who may be entitled to Claim Review Relief are not typical of claims of class members who may be entitled to General Policy Relief," (Hildebrand Obj., Docket Entry # 56), because he ignores the fact that the Complaint pleads claims that are common to all Class Members. The choice of relief that the Class Members select does not affect typicality.

Two more objections best addressed to typicality assert that the settlement class is too "sprawling" and uncohesive to be certified. (Walters Obj. at ¶ 10, Docket Entry # 45;Wolfson Obj. at 9–12, Docket Entry # 94). More specifically, Ms. Wolfson's objection focuses on the difference between the performance claims and the delayed coverage and juvenile smoker claims. She asserts that the delayed coverage and juvenile smoker claims are not about performance and did not involve any top-down training scheme, rather "[t]hey are about coverage, underwritability, convertability, and perhaps one or two other features that are not gradable, graphable, or saleable in the way that the performance schemes allege." (Wolfson Obj. at 12, Docket Entry # 94). She believes that these are competing claims that "place class members in distinct camps with differing interests." (*Id.*). The Court, however, disagrees with Ms. Wolfson's point of view. In endorsing class certification in *Prudential,* the Third Circuit stated that, while the Class suffered various forms of injuries, they all were derived from some alleged common wrong that provided a sufficient basis for a finding of typicality. 148 F.3d at 312. Plaintiffs correctly point out that *Prudential* approved a far broader class of persons, including victims of all improper sales practices. *Id.* at 311, 313. ✱

▉ This is further supported by a recent Third Circuit decision stating that "typicality, as with commonality, does not require 'that all putative class members share identical claims.'" *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d at 531–32 (citation omitted). Likewise, "factual differences among the claims of the putative class members do not defeat certification." *Baby Neal*

---

17. The Court did not receive any objections as to commonality or predominance.

*for & by Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). While there are some differences between the types of improper sales practices alleged, the Court recognizes that the named Class Representatives include members that assert all of the improper sales practices at issue. Since the Class Representatives and Class Members assert claims for similar courses of fraudulent conduct, alleging improper sales practices, the typicality requirement of Rule 23(a)(3) is fulfilled.

### D. Adequacy of Representation

■■■■ As for the adequacy of representation factor, Rule 23(a)(4) requires that "the representative parties [must] fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Courts look at two factors: "(1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class." *Prudential I,* 962 F.Supp. at 519. A party challenging the Class' representation has the burden to prove that the representation is not adequate. *Id.*

These requirements have been met. First, Class Counsel are more than adequate representatives of this Class. They have significant experience in class actions and insurance sales practices cases. (*See* Friedman Decl., Resumes). They have also displayed their diligent and competent representation in the state court cases that led to this Settlement. Second, the named Plaintiffs are appropriate Class Representatives. They have no interests antagonistic to those of the Class and they have indicated their willingness to represent the Class.

Objectors Gambello, Deese, Basil and Costello/Robertshaw assert that there are conflicts between the Class Counsel and Class Representatives on the one hand and the Class Members on the other hand because of the size of the attorneys' fees and incentive awards. (Gambello Obj., Docket Entry # 85; Deese Obj., Docket Entry # 91; Basil Obj., Docket Entry # 105; Costello/Robertshaw Obj., Docket Entry # 66). This objection is factually incorrect because the parties did not commence negotiations on the amount of attorneys' fees and expenses that MassMutual would agree to pay until all material terms of the Settlement had been agreed upon, about one year after settlement negotiations began. (Friedman Decl. ¶¶ 115, 136). Considering that fact and the almost nine year time span of the underlying litigation, that counsel undertook on a contingency fee basis, the Court finds that the size of the attorneys' fees and incentive awards did not compromise Class Counsel's ability or the ability of the Class Representatives to negotiate relief on behalf of the Class. Therefore, the Court is satisfied that the Rule 23(a)(4) requirement is met.

### E. Superiority

Lastly, Rule 23(b)(3) requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." The Rule provides the Court with four non-exclusive factors to aid in its superiority determination:

> (1) the interest of individual members of the class in individually controlling the prosecution of the action; (2) the extent of litigation commenced elsewhere by class members; (3) the desirability of concentrating claims in a given forum; and (4) the management difficulties likely to be encountered in pursuing the class action.

*Prudential I,* 962 F.Supp. at 522.

Here, since the financial losses of most of the Class Members is relatively small, very few would have an interest or ability to pursue their own individual case. This is demonstrated by the relative absence of policyholder suits now pending—only eight cases pending against MassMutual in the entire United States. Also, it is unlikely that individual Class Members would have the resources to pursue successful litigation on their own.

In the context of settlement, the desirability or undesirability of concentrating the litigation of the claims in a particular forum are not significant and are essentially irrelevant. *See Amchem,* 521 U.S. at 620, 117 S.Ct. 2231 (stating that where a district court is confronted with a settlement-only class certification, the court need not inquire whether the

case, if tried, would present manageability problems because the point is that there will be no trial). For the purposes of settlement, concentrating litigation in one forum is desirable. Here, the parties chose this forum because the New Jersey case brought by Plaintiff Paul Varacallo was on the eve of trial, and was the furthest along, and because the District of New Jersey has also resolved other comparable nationwide insurance sales practices settlements. *See, e.g., Prudential I*, 962 F.Supp. 450; *Roy v. Indep. Order of Foresters*, Civil Action No. 97–6225 (D.N.J. Aug. 3, 1999).

Without question, class adjudication of this matter will achieve an appreciable savings of effort, time, and expense, and will promote uniformity of decision on the issues resolved and to which the parties will be bound. This prong is further supported by the unfortunate circumstances of one of the objectors, Ms. Timmick, who appeared at the Fairness Hearing so as to explain her own difficulty in resolving the misrepresentations that she suffered at the hands of MassMutual and to generally object to the Settlement. (*See* Tr. at 110–117). Although she was objecting to the fairness of the Settlement, in light of her own circumstances, the Court finds that the scenario that Ms. Timmick portrayed to the Court, namely years of disputes including an unsuccessful hearing before the insurance commission and the court in Maryland, demonstrates the superiority of this matter being resolved by way of Class Action. To hear her tell her story, her voice was simply not heard by the insurance commission, the Circuit Court in Maryland, and MassMutual. She has spent $15,000 in litigation costs with no success. This clearly supports the superiority of a Class Action.

After examining these factors, and considering the difficulty that individual Class Members would suffer in attempting to bring their own actions, as evidenced by Ms. Timmick's difficulties, the Court finds that "the class action is not only the superior method for adjudicating this controversy, it affords the vast majority of class members the only practical avenue of redress." [18] *Prudential I*, 962 F.Supp. at 522. Absent class certification, very few individuals would have the incentive or resources to bring individual claims against MassMutual. Practically speaking, if this case were not certified today, the millions of Class Members would probably not sue MassMutual. (*See* Redfern 11/17/04 Aff. noting that less than 3,000 exclusion requests had been received). Thus, this class action Settlement represents a superior means to resolving the claims in this case.

## F. This Settlement Class Meets All the Requirements of Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3)

Accordingly, this Court grants final class certification under Rules 23(a), (b)(2), and (b)(3). All objections to final certification of the Class are hereby overruled. Therefore, all persons or entities who satisfy the Class definition,[19] except those who properly requested exclusion from the Class in accordance with the Preliminary Approval Order, and as explained in the Court's Final Order Approving Class Action Settlement, are

---

18. The Court did not receive any objections that questioned the superiority of this matter proceeding as a settlement class action.

19. Objectors Gambello, Basil and Costello/Robertshaw assert in their objections that the class definition creates an improper "fail-safe" class. (Gambello Obj., Docket Entry # 85; Basil Obj., Docket Entry # 105; Costello/Robertshaw Obj., Docket Entry # 66). The Court finds this a groundless objection because the class is carefully defined in plain language and anyone that does not fall within the covered claims is expressly excluded and can pursue their own separate litigation. In fact, the class definition is such that except for those with Delayed Coverage Claims and Juvenile Smoker Claims, policyhold-

ers with Disability Income Policies and Term Life Policies are excluded from the definition of the Class and are free to assert any other claims they may have. As for Mr. Gambello's objection, the Court finds his inconsistent arguments noteworthy. He first contends that this is an "Orwellian settlement" that "seeks approval of a blanket insurance policy masquerading as a settlement that provides absolute immunity from any policyholder claims that might have arisen during a 20 year time span," and then he is concerned about the class definition excluding policyholders with Disability Income Policies and Term Life Policies—except those with Delayed Coverage Claims and Juvenile Smoker Claims. (Gambello Obj. at 2–3, 9, Docket Entry # 85).

members of the Class and are bound by the terms of the Settlement, the Order, the Final Judgment, and are entitled to share the benefits of the Settlement subject to the terms and conditions set forth in the Order and Final Judgment.

## VI. FAIRNESS OF THE SETTLEMENT

■ Federal Rule of Civil Procedure 23(e) requires court approval of any class action settlement. Fed.R.Civ.P. 23(e). The standard for approval is whether the settlement is "fair, reasonable and adequate." *GM Trucks*, 55 F.3d at 785. As an initial matter, since settlement negotiations preceded class certification, and the settlement and class certification are being sought simultaneously, this Proposed Settlement is subject to an even more scrupulous examination in determining its fairness. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 534.

■ Nevertheless, this Proposed Settlement is entitled to an initial presumption that it is fair because "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 535 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n. 18 (3d Cir.2001)). In *Warfarin*, the Third Circuit held that, even though the settlement negotiations preceded the class certification, the District Court correctly applied the presumption of fairness because it found that the four factors were met. *Id.* Here, Class Counsel have shown by way of Friedman's Declaration that this Settlement resulted from intensive arm's length negotiations utilizing their unique familiarity with the facts and law of the state court cases and after having conducted exhaustive discovery. The Court also recognizes that Class Counsel are highly experienced in the prosecution of class actions, both in general terms and with insurance sales practices class actions particularly. Lastly, as explained above, only about .003% of the Class submitted objections to the Court—this is a tiny percentage of the total Class.

As for the "fair, reasonable and adequate" standard, the Third Circuit has broken it down into nine factors that courts must analyze. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975) (hereinafter the "*Girsh* factors").

■ The *Girsh* factors include:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining a class action through trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*See Girsh*, 521 F.2d at 157.

■ "This nine-factor test requires this Court to conduct both 'a substantive inquiry into the terms of the settlement relative to the likely rewards of litigation' and 'a procedural inquiry into the negotiation process.'" *Prudential I*, 962 F.Supp. at 534 (quoting *GM Trucks*, 55 F.3d at 796). Furthermore, the Third Circuit has stated that

in assessing the fairness of a proposed settlement, the Court should be careful not to substitute its image of an ideal settlement for the compromising parties' views: 'The evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.'

*Prudential I*, 962 F.Supp. at 534 (quoting *GM Trucks*, 55 F.3d at 806 (citations omitted)). "Thus, the issue is whether the settlement is adequate and reasonable, not whether one could conceive of a better settlement."

*Id.; see also MetLife,* 1999 U.S. Dist. LEXIS 22688, at *75.

It is well established that the law has long encouraged settlement. *Williams v. First Nat'l Bank,* 216 U.S. 582, 595, 30 S.Ct. 441, 54 L.Ed. 625 (1910); *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d at 534–35. This proposition is equally supported, in the case at hand, by the fact that other courts around the nation have granted final approval to insurance sales practices settlements similar to this. *See, e.g., Grove v. Principal Mut. Life Ins. Co.,* 200 F.R.D. 434 (S.D.Iowa 2001); *Snell v. Allianz Life Ins. Co. of N. Am.,* No. Civ. 97–2784 RLE, 2000 WL 1336640, 2000 U.S. Dist. LEXIS 1336640 (D.Minn. Sept. 8, 2000); *Manners v. Am. Gen. Life Ins. Co.,* No. Civ. A. 3–98–0266, 1999 WL 33581944, 1999 U.S. Dist. LEXIS 22880 (M.D.Tenn. Aug. 11, 1999); *Bussie v. Allmerica Fin. Corp.,* 50 F.Supp.2d 59 (D.Mass.1999); *In re Metropolitan Life Ins. Co. Sales Practices Litig.,* MDL 1091, 1999 U.S. Dist. LEXIS 22688 (W.D.Pa. Dec. 28, 1999); *In re Mfrs. Life Ins. Co. Premium Litig.,* No. 1109, 96–CV–230 BTM (AJB), 1998 WL 1993385, 1998 U.S. Dist. LEXIS 23217 (S.D.Cal. Dec. 21, 1998); *In re Prudential Ins. Co. of America Sales Practices Litig.,* 962 F.Supp. 450 (D.N.J.1997), *aff'd,* 148 F.3d 283 (3d Cir.1998); *Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. 54 (D.Mass.1997). Moreover, this type of insurance sales practices settlement in which the Class Members are offered a choice of (a) a claim review process that offers the potential for full benefit of the bargain relief, or (b) general policy relief that is available automatically to those who do not wish to go through the claim review process, has repeatedly been approved in courts around the nation.[20]

■ As explained below, after carefully weighing the *Girsh* factors and considering the objections, the Court determines that in the current case the Proposed Settlement is indeed fair, reasonable, and adequate and should be approved.

**A. Complexity, Expense and Duration of the Litigation**

Where the complexity, expense and duration of litigation are significant, the Court will view this as weighing in favor of settlement. *Prudential I,* 962 F.Supp. at 536. This factor is "intended to capture 'the probable costs, in both time and money, of continued litigation.'" *GM Trucks,* 55 F.3d at 811 (quoting *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 801 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974)).

Up until now, the parties have already expended significant sums of money on prosecuting and defending the state court cases. For example, the *Varacallo, Karges* and *Russo* cases have already taken more than five years and they have yet to go to trial. *See, e.g., Prudential II,* 148 F.3d at 318 (affirming District Court's determination that the case "would not be completed for years"). Not counting *Gass* and *Wofford,* MassMutual has produced over 800,000 pages of documents and the parties have conducted more than 25 depositions. If those cases were to go forward, or if this case were tried as a litigation class, additional discovery would likely occur, and MassMutual has indicated that it would vigorously oppose certification of a litigation class and probably seek summary judgment. Assuming Plaintiffs prevailed over MassMutual's efforts, a trial would commence that would involve numerous experts on both sides and significant expenses and time. This would inevitably lead to the losing party filing an appeal. Eventually the cases would conclude, however not without significant expense and time being spent by all. "Avoiding this unnecessary and unwarranted expenditure of resources and time benefit[s] all

---

**20.** *See, e.g., In re Gen. Am. Life Ins. Co. Sales Practices Litig.,* 302 F.3d 799 (8th Cir.2002); *Prudential I,* 962 F.Supp. 450, *aff'd as to settlement approval,* 148 F.3d at 298; *Bussie,* 50 F.Supp.2d 59; *Duhaime,* 177 F.R.D. 54; *MetLife,* 1999 U.S. Dist. LEXIS 22688; *Roy,* Civil Action No. 97–6225 (D.N.J. Aug. 3, 1999); *In re Mfrs. Life Ins. Co. Premium Litig.,* No. 1109, 96–CV–230 BTM (AJB), 1998 WL 1993385, 1998 U.S. Dist. LEXIS 23217 (S.D.Cal. Dec. 21, 1998); *Elkins,* 1998 WL 133741, 1998 U.S. Dist. LEXIS 1557; *Michels v. Phoenix Home Life Mut. Ins. Co.,* 1997 N.Y. Misc. LEXIS 171 (N.Y.Sup.Ct. Jan. 3, 1997); *Willson v. New York Life Ins. Co.,* 1995 N.Y. Misc. LEXIS 652 (N.Y.Sup.Ct. Nov. 8, 1995).

parties." *In re Computron Software, Inc.*, 6 F.Supp.2d 313, 317 (D.N.J.1998); *see GM Trucks*, 55 F.3d at 812.

Furthermore, there are a wide range of issues and defenses involved here, such as the elements of fraud, consumer protection statutes, RICO, breach of contract, breach of fiduciary duty, the statute of limitations, damages, and others. For example, *Prudential* and *MetLife* both involved settlements of claims of deceptive insurance sales practices as those alleged here and the courts found their settlements to be preferable to trial. *See MetLife*, 1999 U.S. Dist. LEXIS 22688, at *77 (finding that litigation without settlement would be "lengthy, complex and highly expensive for both parties"); *Prudential I*, 962 F.Supp. at 536 (stating that "the anticipated complexity, costs, and time necessary to try this case greatly substantiate the fairness of the settlement.").

This Settlement secures a prompt and efficient resolution of the Class' claims permitting a substantial recovery without further litigation, delay, expense, or uncertainty. Accordingly, this factor weighs in favor of the Settlement.

### B. Class Reaction to the Settlement

"This factor attempts to gauge whether members of the class support the settlement." *Prudential II*, 148 F.3d at 318. Although courts generally interpret class members' failure to object to proposed settlement terms as evidence that the settlement is adequate, fair and reasonable, *see Fickinger v. C.I. Planning Corp.*, 646 F.Supp. 622, 631 (E.D.Pa.1986) ("[U]nanimous approval of the proposed settlement by the class members is entitled to nearly dispositive weight."), this Court recognizes that other courts have found that any inference drawn from silence may be unwarranted, *see GM Trucks*, 55 F.3d at 812.

In the instant case, 3 million Class Notice Packages were mailed out and as of November 17, 2004 only 2,204 valid exclusion requests were submitted by Class Members. (Affidavit of Richard H. Redfern dated November 17, 2004 ("Redfern 11/17/04 Aff.") at ¶ 4, Docket Entry # 130). As of November 1, 2004, fewer than 100 written objections were received by the Court. That correlates to approximately .06% of the Class has requested exclusion, and approximately .003% of the policies covered by the Settlement have raised objections. These numbers are extremely low. The exclusion requests here are smaller than those in *MetLife* or *Prudential. See, e.g., MetLife*, 1999 U.S. Dist. LEXIS 22688, at *43, 78 (exclusions amounting to about .33% of the class); *Prudential II*, 148 F.3d at 318 (exclusions amounting to about .2% of the class). The objections are comparable to, if not lower, than what occurred in other insurance sales practices settlements. *See, e.g., Prudential I*, 962 F.Supp. at 537–38 (300 out of 8,000,000 or .0036%); *Elkins*, 1998 WL 133741, at *28, 1998 U.S. Dist. LEXIS 1557, at *83–84 (6 out of 109,000 or .0055%).

Furthermore, over 80,000 Class Members have utilized the toll-free telephone numbers to contact the call center or contacted Class Counsel for additional information about the Settlement and how to be included. Both the *Prudential* and *Lucent* courts found this indicative of affirmative endorsement of the settlement. *Prudential II*, 148 F.3d at 318; *Lucent I*, 307 F.Supp.2d at 644.

Lastly, although MassMutual met with regulators before announcing the Proposed Settlement, no regulator submitted an objection. This fact further supports that "the reaction of the class" supports settlement. *American Family Ent.*, 256 B.R. at 418; *see also MetLife*, 1999 U.S. Dist. LEXIS 22688, at *80 (finding it significant support of the settlement that "not one objection to the proposed settlement was filed by any state insurance regulator" even though MetLife had notified them); *Elkins*, 1998 WL 133741, at *31, 1998 U.S. Dist. LEXIS 1557, at *91–92 (stating that the fact that no governmental entities appeared in the litigation favored approval of the settlement).

This matter is similar to that in *Prudential*. There the court found that such little negative feedback, given that there had been an extensive notice and outreach program, weighed in favor of approving the Proposed Settlement. *Prudential I*, 962 F.Supp. at 537. Hence, given the extraordinary notice

that has been provided to Class Members and the relatively small numbers of negative feedback, the Court concludes that the Settlement is generally approved of by the Class.

### C. The Stage of Proceedings and Amount of Discovery Completed

 "The Court must examine the stage of the proceedings to assess 'the degree of case development that class counsel have accomplished prior to settlement.'" *Prudential I*, 962 F.Supp. at 538 (quoting *GM Trucks*, 55 F.3d at 813). The parties should have an "adequate appreciation" of the case's merits when negotiating a settlement of the case. *GM Trucks*, 55 F.3d at 813.

"While the type and extent of discovery taken are relevant to the propriety of a settlement, settlements reached early are still favored." *Lucent I*, 307 F.Supp.2d at 644. Although the present case is less than nine months old, this is most certainly not a case that is settling in the early stages of litigation. As noted previously, in the current case, counsel for the parties did not commence settlement discussions until almost nine years after the first of six cases was initiated. In just three of those cases, over 800,000 pages of documents were produced by MassMutual and more than 25 depositions took place. In addition, Class Counsel obtained experts to assist them in the settlement process. *See Lucent I*, 307 F.Supp.2d at 638 (noting that class counsel had "hired experts to assist them in evaluating the merits of their claims and the risks of litigation"). Moreover, the settlement discussions themselves were not easy, it took nearly one year of hardfought face-to-face meetings and telephone conferences to come to an arms-length result.

Given the vast "degree of case development that class counsel have accomplished prior to settlement," *GM Trucks*, 55 F.3d at 813, this Court finds that the parties certainly had an "adequate appreciation" of the case's merits when they were negotiating this Proposed Settlement and that settlement at this stage is not premature. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d

at 537 (concluding that class counsel adequately appreciated the merits of the case before negotiating settlement where they had previously pursued litigation for over three years before the cases were consolidated by the MDL panel, defendant had produced hundreds of thousands of documents through discovery, there had been numerous depositions, and class counsel consulted with experts).

### D. The Risks of Establishing Liability and Damages

 This Court must also "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Prudential II*, 148 F.3d at 319. However, in doing so, a court need not conduct a "mini-trial and must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel[.]" *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 181 (E.D.Pa.2000) (citation omitted).

The Court recognizes that a number of similar insurance sales practices cases have failed on dispositive motions. *See, e.g., In re New England Life Ins. Co.*, 346 F.3d 218 (1st Cir.2003); *In re Minn. Mut. Life Ins. Co.*, 346 F.3d 830 (8th Cir.2003); *Moore v. Paine-Webber, Inc.*, 306 F.3d 1247 (2d Cir.2002); *In re Northwestern Mut. Life Ins. Co. Sales Practices Litig.*, 70 F.Supp.2d 466 (D.N.J. 1999), *aff'd*, 259 F.3d 717 (3d Cir.2001). The Defendants here, were even able to defeat similar cases. *See, e.g., Shocklee v. Mass. Mut. Life Ins. Co.*, 369 F.3d 437 (5th Cir. 2004); *Markarian v. Connecticut Mut. Life Ins. Co.*, 202 F.R.D. 60 (D.Mass.2001) (class certification was denied and plaintiff's appeal was dismissed with prejudice on March 13, 2002); *Cunningham v. Mass. Mut. Life Ins. Co.*, No. 4:95–CV–417–B–B (N.D.Miss.) (the case settled and a judgment dismissing the case with prejudice was entered on March 4, 2000); *Thelen v. Mass. Mut. Life Ins. Co.*, 111 F.Supp.2d 688 (D.Md.2000); *Cohn v. Massachusetts Mut. Life Ins. Co.*, 189 F.R.D. 209 (D.Conn.1999); *McCown v. Hayden, et al.*, No. 01–03867 (193rd Jud. Dist. Dallas

County, Tex.) (the appellate court affirmed the denial of class certification and dismissed the entire case on April 22, 2004); *Solomon v. Mass. Mut. Life Ins. Co.*, 47 Pa. D & C 4th 36, 2000 WL 33116006 (Pa.Cty.Sup.Ct.2000); *O'Brien v. Mass. Mut. Life Ins. Co.*, No. 96–0160 (Mass. Superior Ct.) (the case settled and was dismissed by the court on March 20, 2000); *Elliott v. Mass. Mut. Life Ins. Co.*, No. 333733 (Az. Superior Ct.) (the court granted MassMutual's motion for summary judgment and pursuant to the parties' stipulation, the case was dismissed on September 9, 2002).

In addition to defenses to liability, Plaintiffs would have to overcome any defenses regarding damages that Defendants would assert. Thus, although the Plaintiffs have had some success in their state court actions, the Court acknowledges that MassMutual could likely defend itself successfully in further litigation.

Weighing these factors against the immediate and certain settlement presented to this Court, this Court concludes that without a doubt this Settlement is the better course of action.

### E. The Risks of Maintaining the Class Action Through Trial

As previously stated, this Court's decision to certify this Class is for settlement purposes only. MassMutual has specifically reserved the right to challenge any other type of class certification.

Assuming this Court were to certify this Class for litigation purposes, there is a significant risk of decertification at a later stage in the litigation, such as if the Class becomes unmanageable—a factor that does not pose a problem in a settlement class. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 537. The Third Circuit has stated that a risk of decertification supports settlement. *Id.; Prudential II*, 148 F.3d at 321. Thus, this factor weighs favorably in support of settlement.

21. Courts have even noted that there could be an additional effect on the Defendants' credit rat-

### F. The Ability of the Defendants to Withstand a Greater Judgment

This *Girsh* factor considers " 'whether the defendants could withstand a judgment for an amount significantly greater than the settlement.' " *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 537–38 (quoting *Cendant*, 264 F.3d at 240). The estimated minimum value of this Proposed Settlement is $698.7 million, plus legal fees and expenses, and administrative costs. While there are still other costs that Defendants will incur, there is no reason to believe that the Defendants are unable to withstand a greater judgment. Defendants failed to address this point in their brief, and Plaintiffs assert that Defendants could withstand a greater judgment, though at some point their credit ratings would be adversely affected.[21] However, Class Members will have the opportunity to obtain a full-recovery under this Settlement, so its not clear to what degree a greater judgment would recompense Class Members. Thus, the Court finds that the Defendants' ability to withstand a greater judgment neither weighs in favor of or against approval of the Settlement.

### G. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The Court must now consider how the Settlement compares to the range of best possible outcomes for the Class. These "last two *Girsh* factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *Id.* at 538. In order to assess the reasonableness of the Settlement in a case primarily involving monetary relief, the Third Circuit has stated that " 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.' " *Id.* (quoting *Prudential II*, 148 F.3d at 322).

ings. *See MetLife*, 1999 U.S. Dist. LEXIS 22688, at \*89; *Prudential II*, 148 F.3d at 322.

As in *Prudential,* the Class Members here are given a choice of a claim review process (there it was ADR) or automatic relief in the form of additional or enhanced insurance (there it was Basic Claim Relief or "BCR"). In *Prudential I,* the court stated that "[t]o estimate the best possible recovery for plaintiffs in the aggregate would be exceedingly speculative, and unnecessary here." *Prudential I,* 962 F.Supp. at 540. This Court agrees. The General Policy Relief, offered here to all Class Members with Permanent Policies, provides real relief, not merely a coupon. The Claim Review Process, should a Class Member affirmatively elect it, can provide a Class Member with monetary relief in accordance with the nature and strength of their claim-up to complete relief for the full benefit of the original bargain. When the risks of litigation are taken into account, it is doubtful that even if the Class were to successfully litigate this matter that their individual recoveries would be in excess of the one offered by this Settlement.

This Settlement yields substantial and immediate benefits, and it is reasonable in light of the best possible recovery and the attendant risks of litigation—little or no recovery at all. *See Lucent I,* 307 F.Supp.2d at 648 (quoting *In re Saxon Sec. Litig.,* Nos. 82–cv–3103 (MJL), 1985 WL 48177, at *13 (S.D.N.Y. Oct. 30, 1985)). Thus, "an individual's recovery exceeds the value of the best possible recovery discounted by the risks of litigation." *Prudential I,* 962 F.Supp. at 540.

### H. Class Counsel's Approval of the Settlement

Class Counsel's approval of the Settlement also weighs in favor of the Settlement's fairness. *See Prudential I,* 962 F.Supp. at 543 ("the Court credits the judgment of Plaintiffs' Counsel, all of whom are active, respected, and accomplished in this type of litigation.") (citing *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977) (court is "entitled to rely upon the judgment of experienced counsel for the parties") and *Smith v. Vista Org., Ltd.,* 1991 WL 152612, at *5, 1991 U.S. Dist. LEXIS 10484, at *16 (S.D.N.Y. July 30, 1991) (in appraising fairness of proposed settle-

ment, view of experienced counsel favoring settlement is entitled to "considerable weight")). Thus, the Court puts credence in the fact that Class Counsel consider the Proposed Settlement to be fair, reasonable and adequate.

### I. The Proposed Relief to the Injured Policyholders

As was previously discussed, this Proposed Settlement offers significant value to the injured policyholders. The estimated value of CRP and GPR, alone, are at not less than $698.7 million. The Claim Review Process, should a Class Member affirmatively elect it, can provide a Class Member with monetary relief in accordance with the nature and strength of their claim. Thus, where the evidence supports their claim, they can receive complete relief for the full benefit of the original bargain. The Proposed Settlement also offers real relief to Class Members with Permanent Policies through the General Policy Relief. This is not a case in which the Class Members receive a coupon that necessitates a future purchase; these Class Members essentially receive free insurance even though they cannot establish that they were injured by Defendants' alleged deceptive sales practices. The Court thus finds that this is adequate relief to the injured policyholders.

### J. The Remaining Objections to the Proposed Settlement

While the Court finds that the overall number of objections is low in comparison to the over three million Class Members, the Court has carefully reviewed the stated concerns of the objectors giving them generous weight particularly where they were *pro se.* Although Defendants have pointed out that some of the objections have been submitted by "professional objectors" on behalf of Class Members, and that "[f]ederal courts are increasingly weary of professional objectors," *O'Keefe v. Mercedes–Benz United States, LLC,* 214 F.R.D. 266, 295 n. 26 (E.D.Pa. 2003), this Court has still given these objections full consideration.[22] Nevertheless, as

---

**22.** The Court does recognize that many of the

objections that have been raised by the so–called

explained below, and without the need of discussing each individual objection, this Court finds that the substance of all of the objections submitted to the Court are without merit.

### 1. Objections to the Terms of the Settlement

#### (a) Objections to the General Policy Relief

About thirty-five objections focused on the perceived unfairness or inadequacy of the General Policy Relief. Many of the objectors' grievances with the proposed GPR assert that the benefit or a Settlement Death Benefit is inadequate, unfair or does not address the individualized harm sustained by a particular Class Member with a Permanent Policy. For example, the argument that the GPR only offers additional death benefits that may never be claimed by Class Members with Permanent Policies because they would have to die during the benefit period in order to recover the benefit is a risk that flows from any life insurance policy. (*See, e.g.,* Sylberbrg Obj., Plante Aff. at Ex. 24; Gray/Bolkin Obj. at 8–10, Docket Entry # 93; Matijevich Obj., Docket Entry # 23; Bobowick Obj., Plante Aff. at Ex. 3; Gambello Obj. at 17, Docket Entry # 85; Denaker Obj., Docket Entry # 74; Costello /Robertshaw Obj. at 3, Docket Entry # 66). This objection has been specifically rejected by the District of Minnesota in *Snell,* 2000 WL 1336640, at *18, 2000 U.S. Dist. LEXIS 13611, at *56 n. 15. Two objectors even stated that the Settlement Death Benefit is no better than "lottery tickets." (*See, e.g.,* Kinser Obj., Docket Entry # 119; Walters Obj., Docket Entry # 45).

First of all, the GPR is not the only relief being offered in this Settlement—CRP is also available. Any objection that GPR is unsatisfactory is defeated by the fact that Class Members with Permanent Policies have the choice of a second remedy that is available. *See, e.g., Duhaime,* 177 F.R.D. at 71–72; *Prudential I,* 962 F.Supp. at 557; *Michels,* 1997 N.Y. Misc. LEXIS 17, at *57. Second, these Class Members all purchased life insurance products so they are well aware of the inherent risks that they may outlive the period of coverage. That risk, however, does not make the benefit "illusory" or inadequate. Rather, it is an added protection provided automatically at no additional cost to Class Members that may or may not otherwise qualify for additional coverage due to their age or health condition. Other courts have agreed that this type of benefit has substantial value to Class Members. *See, e.g., Manners,* 1999 WL 33581944, at *24, 1999 U.S. Dist. LEXIS 22880, at *72–73 (stating that "the free protection itself has a value to the Class as a whole, as demonstrated by Class Members' prior purchase of life insurance."); *Garst v. Franklin Life Ins. Co.,* 1999 U.S. Dist. LEXIS 22666, at *73 (N.D. Ill. June 28, 1999) (same); *In re Real Estate Title & Settlement Serv. Antitrust Litig.,* 1986 WL 6531, at *18, 1986 U.S. Dist. LEXIS 24435, at *60–61 (E.D. Pa. June 10, 1986) (holding that additional free title insurance provided a benefit to class members regardless of whether they made a claim on that insurance), *aff'd,* 815 F.2d 695 (3d Cir.1987). Moreover, MassMutual is even going to use its best efforts to identify and search for Class Members that have "died during the applicable Settlement Death Benefit duration period." (S.A. § IV(B)).

Other objections assert that the Settlement Death Benefit should be provided for a longer duration, (*see, e.g.,* Finn Obj., Docket Entry # 24; Cronin Obj., Docket Entry # 36; Hammill Obj., Plante Aff. at Ex. 8; Decker Obj., Docket Entry # 28; Kominers Obj., Docket Entry # 37), or that some other form of relief should be provided such as a straight cash payment, policy credit, or premium reduction, (*see, e.g.,* Decker/Wilson Obj., Docket Entry # 41; Sealy Obj., Docket

"professional objectors" have been raised in other courts in other class actions. *See, e.g., Snell,* 2000 WL 1336640, at *1, 2000 U.S. Dist. LEXIS, at *2–3 (objection by R. Stephen Griffis on behalf of a class member); *Clark v. Experian Info. Solutions, Inc.,* 2004 WL 256433, at *3 n. 15 (D.S.C. Jan. 14, 2004) (objection by Michael Caddell);

*Shields v. Bridgestone/Firestone, Inc.,* 2004 WL 546883, at *9 n. 2, *33 n. 12 (Texas Dist. Ct. March 12, 2004) (objections by Mitchell Toups and Michael Caddell); *In re AXA Financial Inc.,* 2002 WL 1283674, at *1 (Del.Ch. May 22, 2002) (objection submitted by G. Clinton Kelley).

Entry # 75). These objectors are not taking into account that a Settlement is a compromise, "a yielding of the highest hopes in exchange for certainty and resolution." *GM Trucks*, 55 F.3d at 806. This Court's role is to determine whether the proposed relief is fair, reasonable and adequate, not whether some other relief would be more lucrative to the Class. "A settlement is, after all, not full relief but an acceptable compromise." *Duhaime*, 177 F.R.D. at 72.

Jennifer Gray and Eve Bolkin [23] also incorrectly assert that the GPR fails to adequately remedy the harm alleged in the Complaint and/or improperly compromises the claims of Class Members residing in New Jersey or California. (*See* Gray/Bolkin Obj. at 8–10, Docket Entry # 93). In addition, the Sealy objectors state "The benefit received by Class Members with regard to a proposed settlement should have a reasonable relationship to the wrongs alleged of the defendant and should have a correlation with the type of relief that would reasonably be anticipate if the case was to be tried." (Sealy Obj. at 3, Docket Entry # 75). These Class Members with Permanent Policies who believe that they are entitled to "cash" or some other relief had the opportunity to submit their claims to the Claim Review Process where they would have the chance to establish the merit of their individual claim and be awarded relief that is tailored to their injury. These Class Members also had the opportunity to request exclusion and separately litigate their claims. The GPR provides an automatic free benefit to these Class Members with Permanent Policies without them even having to establish that they were the subject of any of the alleged wrongdoings by MassMutual—this is a significant benefit to the Class and the Court therefore overrules these objections.

### (b) Objections to the Claim Review Process

Other objections are with the Claim Review Process asserting that it is unfair because there is a lack of a formal appeals process, they dislike the scoring system, or they take issue with the request that Class Members submit supporting documentation with their claim. Several objections focus on the lack of appeal procedures that were permitted in settlements in other cases, such as *Prudential.* (*See* Balick Obj., Docket Entry # 21; Wolf Obj., Docket Entry # 50; Beckett Obj., Plante Aff., Ex. 2). These objectors, however, fail to recognize that the appeals process would be costly and could drag on in endless uncertainty for many Class Members. The parties in this case reviewed other insurance sales practices settlements and opted for a streamlined single-tiered Claim Review Process as opposed that the multi-level processes used in *Prudential* and *Michels,* which Beckett cited. (Beckett Obj. at 11, Plante Aff., Ex. 2).

There are also objections to the claim scoring guidelines because they allow the Claim Evaluator the discretion to award a "0" in certain circumstances. (Beckett Obj. at 6–7, Plante Aff., Ex. 2; Gray/Bolkin Obj. at 10–11, Docket Entry # 93). If a claimant receives a "0" as a score then they do not receive any award. The objectors assert that this is unfair. However, as Defendants explain, "a score of zero is designed to prevent the submission of fraudulent or frivolous claims brought solely to try to 'game the system.'" (Def. Opp. Brief at 12). Another objector similarly argues that "[i]f Claim Review Relief (CRR) is denied, there is no automatic 'fall-back' to General Policy Relief (GPR)." (Balick Obj., Docket Entry # 21). Thus, if it is not a legitimate claim then they will not receive any relief and the claimant should have done nothing and received the GPR. Claimants should not be rewarded for submitting unfounded claims to CRP by having the "fall-back" of GPR. If the claimant scores a "1," demonstrating that "the information in the Claim File, considered as a whole, neither supports nor undermines the Claim," (S.A. Ex. A, at 8–9), then the claimant does have the "fall-back" of GPR.

Moreover, the Court has no reason to believe that the Claim Evaluator, selected by Class Counsel and approved by this Court, would indiscriminately apply a "0" to a le-

---

**23.** In fact, Bolkin chose CRP after speaking with Class Counsel. (Pl. Opp. Brief at 24; Pl. Corrected Aff. of Bruce D. Greenberg in Resp. to Objections, at 3).

gitimate claim or be unfair in his evaluations. (*See* Wolf Obj., Docket Entry # 50; Salerno Obj. at 2, Docket Entry # 82). The Claim Evaluator in this case is an experienced attorney representing policyholders in insurance sales practices matters and has effectively served in other cases as Claim Evaluator. (Friedman Decl. at ¶ 122). The Court is further assured of the fairness of this process because the burden is on Mass-Mutual to come forward with documentation to contradict any claim alleging misrepresentation. MassMutual must provide the Claim Evaluator with the Policy File, including the application file, account values, Policy transactions, complaint file, the Producer's complaint data, and Policy charges and premiums. (S.A. at §§ II(A)(57) and V). This holds MassMutual to a high standard and makes it less likely that a claimant would score a "0" on their claim.

The Court likewise finds unpersuasive the objections that the requirement of submitting documentation in support of a claim is unfair. Initially, it is not "unreasonable" to assume that Class Members would have retained documentation supporting their allegations of insurance sales practices abuses. (*See* Shmagin Obj., Docket Entry # 57; Koppel Obj., Docket Entry # 111; Greenbaum Obj., Docket Entry # 63). Notwithstanding, the objection fails to acknowledge that relief is still available under the CRP even if the claimant fails to submit supporting documentation—they can still submit a claim and score up to a "3". (S.A. at § II(C)(3)). *See Elkins*, 1998 WL 133741, at *28, 1998 U.S. Dist. LEXIS 1557, at *84 (rejecting similar objection stating "the objection does not recognize that relief is available without documentary evidence, even under the Claim Review Process"). As stated above, MassMutual must submit the Policy File which may contain information that would support the individual's claim. (S.A. at 31, 34). All the same, this scoring system has been approved in other insurance sales practices settlements. *See, e.g., MetLife,* 1999 U.S. Dist. LEXIS 22688, at *22; *Garst,* U.S. Dist. LEXIS 22666, at *29; *Manners,* 1999 WL 33581944, at *23, 1999 U.S. Dist. LEXIS 22880, at *68–69.

Lastly, objector Mucklow contends that the Settlement does not address "those who had been misled as a retirement vehicle." (Mucklow Obj., Docket Entry # 117, 154). Mr. Mucklow appeared at the Fairness Hearing and voiced this concern, but in his latest letter to the Court he states that this issue was never responded to at the Hearing. (Mucklow Obj., Docket Entry # 154). This concern was, however, specifically addressed by the Court and Mr. Friedman towards the end of the Hearing:

THE COURT: But what about the argument that what they were purchasing was not really life insurance, it was an investment vehicle, and in essence what they are getting as a benefit now is really short-term life insurance?

MR. FRIEDMAN: Two answers. The first answer is somebody who bought based upon an alleged retirement type scheme has a recourse to the claim review process, and that has things that are tailored to provide very specific relief. But apart from that on the death benefits side, everybody who is in the class bought life insurance, and really one way or another, ... you bought a certain amount of life insurance for a certain price based upon the representation of how many payments you would need to make or what it would cost, and ultimately by providing additional life insurance what you are doing is redoing the equation to provide more of the same product that people initially bought.

In the retirement situation it is a little more attenuated because I admit the whole premise is I never wanted insurance in the first place, but those people knew for a long time what they bought. When the insurance policies arrived, they knew they had insurance. Those people will know now if they have a claim because if they said I didn't want an insurance policy, those people should elect to the claim review process.

(Tr. at 129–130). The Court agrees.

Arlene Timmick expressed a similar objection at the Fairness Hearing, (Tr. at 116), and in her follow up letter to the Court, (Timmick Letter, Docket Entry # 156). Timmick contends that her policy was sold to

her for purposes of retirement. (Timmick Letter at 1). In her letter, Timmick states that having talked with other policyholders and the MassMutual hotline "I did feel some of my issues were over and above the normal Policy Holder and I wanted to be sure I was following the right path." (Timmick Letter at 1).

The recourse for those misled into buying life insurance when they wanted an investment vehicle is properly dealt with through the CRP. The other option was to request exclusion from the Settlement and pursue separate litigation. All of the objections addressed to the fairness or adequacy of the CRP are overruled.

### (c) Objections to the Scope of the Release

▮ To the extent objectors argue that the Settlement is not fair because the scope of the release is too broad, including claims not pled in the Complaint or unknown to the Class Member, the Court finds these objections without merit. The Court recognizes that in class action settlements, releases may include all claims that arise out of the same course of conduct alleged in the Complaint, *see Prudential II*, 148 F.3d at 326; *Grimes v. Vitalink Communications Corp.*, 17 F.3d 1553, 1563 (3d Cir.1994); *Sandler Associates, L.P. v. BellSouth Corp.*, 818 F.Supp. 695, 704–05 (D.Del.1993), *aff'd*, 26 F.3d 123 (3d Cir.1994); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287–88 (9th Cir.1992); *TBK Partners Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir.1982); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir.1981), *cert. denied sub nom. CFS Continental, Inc. v. Adams Extract Co.*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982), releases of known and unknown claims, *Prudential II*, 148 F.3d at 326; *Bussie*, 50 F.Supp.2d at 85; *Duhaime*, 177 F.R.D. at 77, or even claims over which the court lacked jurisdiction, *Prudential II*, 148 F.3d at 326 & n. 82; *Grimes*, 17 F.3d at 1563.

Certain objectors argue that the release improperly releases "future" claims. (*See* Gambello Obj., Docket Entry # 85; Deese Obj., Docket Entry # 91; Basil Obj., Docket Entry # 105; Costello/Robertshaw Obj.,

Docket Entry # 66). Specifically, objectors Costello and Robertshaw argue that the release "would strip numerous class members of the right to assert unrelated and unasserted claims against defendants and cause many others to lose access to the court system altogether." (Costello/Robertshaw Obj. at 5, Docket Entry # 66). These objectors are mistaken. The law allows a release to bar future claims for conduct that occurred in the past that are based on the same factual predicate as those claims in this action. *See Schwartz v. Dallas Football Club, Ltd.*, 157 F.Supp.2d 561, 578 (E.D.Pa.2001). That is all the release at hand precludes. Future claims for future conduct are not included in the release. Indeed, the Settlement Agreement specifically states "nothing in this Release shall be deemed to ... (ii) release a Class Member's right to assert any claims that independently arise from acts, facts, or circumstances arising exclusively after the end of the Class Period." (S.A. at 47).

The Court overrules the objections by Costello/Robertshaw and Deese that there is no consideration for this release. (*See* Costello/Robertshaw Obj., Docket Entry # 66; Deese Obj. Docket Entry # 91). This is not a situation where there is "inadequate consideration," *Schwartz*, 157 F.Supp.2d at 578 (finding "inadequate consideration"), or where there is "no consideration," *Norman v. McKee*, 431 F.2d 769, 774 (9th Cir.1970) (holding that "no consideration" existed for part of the settlement), *cert. denied sub nom. Sec. Pac. Nat'l Bank v. Myers*, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971), rather there are millions of dollars in cash and additional life insurance coverage that is being provided to the Class, which includes former and current policyholders, in exchange for the release.

The release in this case is very similar to the release approved in *Prudential*. *See Prudential II*, 261 F.3d at 367 (finding valid a release that covered all claims "on the basis of, connected with, arising out of, or related to, in whole or in part, the Released Transactions."). Likewise, the Court finds this release proper and overrules the objections.

### 2. Objection as to Lack of an Expert Valuation Report

The objection submitted by Basil that "[t]he settling parties' valuation of the benefits to the proposed class as at least $130 million is unsupported" is incorrect. (Basil Obj. at 5, Docket Entry # 105). Both Plaintiffs and Defendants have provided the Court with reports from their actuaries that supports the valuation of the benefits to the proposed Class. The Declaration of Terry M. Long, FSA, MAAA, Plaintiffs' consulting actuary, states:

> The Settlement has been structured to guarantee that a minimum of $130 million will be paid through CRP. If, after all CRP Claims have been scored and initial relief determined, the preliminary Aggregate CRP Relief to be awarded is less than $130 million, then an amount equal to the difference between $130 million and the Aggregate CRP Relief will be provided to certain Class Members.

(Long Decl. at 17, ¶ 34). The Court recognizes that Terry Long, Senior Vice President and Principal of Lewis & Ellis, Inc., an actuarial consulting firm, has extensive experience in the valuation of settlements in class actions alleging similar deceptive sales practices. (*Id.* at 2–3). In addition, Defendants obtained a similar actuarial analysis of the benefits in the Proposed Settlement from Godfrey Perrott, FSA, MAAA, and William C. Hines, FSA, MAAA, of Milliman, Inc., a leading actuarial firm that provides consulting services to most of the major life insurance firms in this country.

### 3. Objection on the Theory that MassMutual Could Demutualize

At the Fairness Hearing, Edward Cochran, an attorney appearing for the first time for nine objectors,[24] asserted a new argument that had not been raised by his clients in their written objection or by any other objector. At the Hearing, Mr. Cochran put forth the following argument that had never been presented to the Court:

> one issue that has not been addressed by any objectors, not addressed by plaintiffs' counsel, not addressed by defense counsel that I think dwarfs all others only for the reason that it could totally eliminate all of the settlement benefits of the class, reduce them to zero, and, in fact, potentially make the settlement benefits a negative A, and that is the issue of [recapture]. . . .
>
> . . . Massachusetts Mutual is a mutual company, of course, who some day likely will demutualize like a majority of large mutual insurance companies have already done. Were they to demutualize, as the current settlement agreement stands, they would be free to use the accounting and actuarial method in the demutualization to recover back directly from all class members that which they received. That method essentially is when you demutualize, one of the processes that must be concluded is a calculation of net distributable surplus, i.e., the value in the company which in the mutualization will be distributed to the policyholders.
>
> When that is done without any limitation on the Massachusetts Mutual settlement agreement, . . . they could simply take the entire cost of this settlement and the plaintiffs' attorneys' fees and the defendants' attorneys fees and any and all monies that are used to settle opt-out cases right off the top of the number, thereby literally taking back at the time of the demutualization dollar for dollar and more directly from each policyholder that which he is supposedly designed to receive in this case.

(Tr. at 86–87). It is notable that Mr. Cochran points out that nobody raised this argument prior to the Fairness Hearing, on November 22, 2004, because it was never raised by Mr. Tsai on behalf of the same objectors in their objection submitted to the Court on

---

24. The nine objectors are: William H. Yoes, James Henderson, Alexander Jones, Jeffrey Clemmons, Ernest J. Browne, Jr., Vondell Tyler, Daniel Sparks, Chigozie Offor and Joseph Galluze. (Yoes Obj.; Tr. at 85–93, Docket Entry # 106). In their timely written objection, these objectors were represented by Stephen Tsai. For some unexplained reason, only five of the objectors, James Henderson, Alexander Jones, Jeffrey Clemmons, Daniel Sparks, and Chigozie Offor, participated in the untimely supplemental memorandum submitted by Mr. Cochran on December 7, 2004 that directly addressed this demutualization issue.

October 25, 2004.[25] This argument was not mentioned in Mr. Tsai's motion to admit Mr. Cochran *pro hac vice*, which was filed on November 19, 2004, the eve of the Fairness Hearing. Indeed, it was not raised until Mr. Cochran addressed the Court at the Fairness Hearing. Further, without seeking the Court's permission, Mr. Cochran submitted a supplemental memorandum on December 7, 2004 that solely addressed this demutualization issue. With the Court's permission, and to reduce any prejudice to the Parties that had no notice of this argument, Plaintiffs and Defendants submitted short briefs in opposition to Mr. Cochran's supplemental memorandum.

Initially, the court observes that the Class Notice specifically stated, in bold letters, that objections must be submitted:

**in writing and must be *received* by the Court and the Parties no later than October 25, 2004.... The Court will not consider any objections *filed* after October 25, 2004. Late objections will be deemed to have been given up or waived.**

(Class Notice, at 11 (emphasis in original)). Based on the date that the Yoes objectors submitted their initial objection, October 25, 2004, the Court concludes that they were well aware of this deadline. Although this Court and the Class Notice unambiguously stated that this Court would not consider any late objections, and courts frequently overrule untimely objections, *see, e.g., Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 476 (S.D.Fla.2002) ("Given that the objections are extraordinarily untimely, that no valid excuse has been shown, and that substantial prejudice to the parties would result, they are denied."); *Manners v. Am. Gen. Life Ins. Co.*, 1999 WL 33581944, at *24, 1999 U.S. Dist. LEXIS 22880, at *72 (untimely objection overruled); *Cook v. McCarron*, 1997 WL 47448, at *16, 1997 U.S. Dist. LEXIS 1090, at *53 (N.D.Ill. Jan. 22, 1997) (denying motion to file untimely objections); *In re Centocor, Secs. Litig.*, 1993 WL 189937, at *7, 1993 U.S. Dist. LEXIS 7229, at *10 n. 5 (E.D. Pa. June 2, 1993) (refusing to consid-

er late objections); *Roberts v. Heim*, 1991 WL 427888, at *1, 1991 U.S. Dist. LEXIS 18208, at *3 (N.D.Cal. Aug. 28, 1991) (no legitimate excuse for filing objections two weeks late); *Haynes v. Shoney's, Inc.*, 1993 WL 19915, at *2, 1993 U.S. Dist. LEXIS 749, at *6 (N.D.Fla. Jan. 25, 1993) (objections filed two days after deadline "would be reason enough to reject ... objection"), this Court has considered this particular objection for thoroughness sake and finds it is without merit. While Mr. Cochran asserts that "almost all mutual companies are considering demutualization," and that MassMutual "would have tremendous incentive to do so, as they could save the company the entire cost of the settlement," he fails to substantiate this argument with anything more than speculation and one example that this occurred three months after the Western District of Pennsylvania approved the nationwide class settlement in *MetLife.* (*See* Objectors' Supplemental Memorandum Re: Recapture of Settlement Benefits by Massachusetts Mutual Life Insurance Company ("Cochran Suppl. Memo.") at 1–2, Docket Entry # 150). He proposes that in order to avoid the recapture of the settlement costs, in the event that MassMutual does demutualize, that one sentence should be inserted in the Settlement Agreement:

In any demutualization of the company, Mass Mutual cannot recapture the costs of the settlement benefits to these class members by accounting for said costs to diminish the distribution in the demutualization to the class members.

(Cochran Suppl. Memo. at 4). Since this is a serious allegation, the Court feels compelled to consider the argument.

Defendants contend that there is no concrete evidence, other than what occurred with an unrelated insurance company, that MassMutual plans to demutualize and recapture the costs of this Settlement. (Defendants' Supplemental Mem. of Law Responding to the Objection of Edward Cochran on Behalf of the Yoes Objectors ("Def.Suppl.Opp.") at 4, Docket Entry # 151). In fact, at the Fairness Hearing,

---

**25.** Interestingly, however, one Class Member did propose that the Court force the demutualization of Defendants. (*See* Plante Aff. Ex. # 21, Patterson Obj.).

Mr. Hooper represented to this Court that "... there is no intent to try to resolve the settlement, to my knowledge and I have been their counsel, in order to get to a point to demutualize...." (Tr. at 136). Further, in a letter dated February 15, 2004, Robert O'Connell, the Chief Executive Officer of MassMutual stated:

> MassMutual enjoys enviable financial strengths. We continually examine our organizational structure, and we have determined that the mutual form serves us very well at the present. Our loyalties are not divided between policyholders and shareholders. As a mutual company, we can be insulated from the wave of consolidation that has swept our industry, yet our capital reserves are adequate for those strategic acquisitions that might arise. As Standard & Poor's succinctly put it in November when reaffirming our AAA rating, 'MassMutual is wellpositioned for sustained revenue, operating earnings, and capital growth due to its well-diversified business profile.'

*See* 2003 MassMutual Annual Report (*cited in* Def. Suppl. Opp. at 4). In sum, Defendants' contend that "Mr. Cochran's arguments regarding recapture of benefits and demutualization are baseless." (Def. Suppl. Opp. at 4).

Plaintiffs contend that the *MetLife* case is tangential. They point out that in *MetLife* the company had approved the demutualization plan on September 28, 1999, three months before the court approved the class action settlement on December 28, 1999. (Plaintiffs' Brief in Opposition to Supplemental Brief of the Cochran Objectors ("Pl. Suppl.Opp.") at 1, Docket Entry # 152 (citing *In re MetLife Demutualization Litig.*, 156 F.Supp.2d 254, 258 (S.D.N.Y.2001))). Here, MassMutual has not made a decision to demutualize. The Plaintiffs also point out that if such did occur, "MassMutual could not take away Settlement Death Benefits from Class Members who chose GPR, or the cash or cash values added to policies of those who get relief in CRP." (Pl. Suppl. Opp. at 1).

Further, the Plaintiffs ask the Court not to speculate about the state of MassMutual's surplus if it did demutualize at some hypothetical time, as Mr. Cochran asks this Court to do and as he asked the *Wright* court to do. (*Id.* (citing *Wright v. Prudential Ins. Co. of Am.*, 285 F.Supp.2d 515, 524 (D.N.J.2003) (stating that in the four years that lapsed between the settlement and the regulatory approval of the demutualization, "there is no way to be certain that the money Prudential expended on the Costs & Expenses would necessarily have been a part of the company's surplus at the time of demutualization had the company not been under order to pay for the Costs & Expenses.")))). Lastly, the Plaintiffs argue that if MassMutual sought to demutualize, and if it attempted to recapture settlement costs, MassMutual would have to seek regulatory approval and the approval of its policyholders. (*Id.* at 2).

Additionally, the Court conducted its own research and found the following statement on MassMutual's website discussing its organizational structure:

> We strongly believe that, at least for the present, retaining our mutual form of ownership best serves our customers. Conversion to public ownership remains a future option, but for now would prove expensive and time-consuming. Our attention and resources remain focused on our core mission, which is serving our customers—not just at one moment in time—but over the lifetime of their relationship with us.

MassMutual Organizational Structure, *available at* http://www.massmutual.com/mmfg/about/customers/orgstructure.html (# 040768–000 May 2004) (footnote omitted). In conclusion, the Court agrees with the parties that it is sheer speculation that MassMutual would demutualize and that, if it did, it would also seek to recapture the costs of this Settlement. The Court is not going to impose the proposed amendment on the parties and require its inclusion in the Settlement Agreement. As Plaintiffs stated "it would interfere with any company's ability to resolve a contingent liability because it would require the company to limit its future decision-making in advance." (Pl. Suppl. Opp. at 3).

All additional objections were considered by the Court, and are overruled as having no merit. For the most part, these objections

are general laments about the perceived unfairness of the Proposed Settlement. Thus, the Court, having considered all of the objections submitted to it, including those objections that were untimely filed, it is the conclusion of this Court that the substance of the objections to this Proposed Settlement are without merit and do not weaken this Court's decision that the Settlement is fair, adequate and reasonable, and that the Settlement provides substantial and real benefits to the Class.

## VII. ATTORNEYS' FEES AND EXPENSES, AND INCENTIVE AWARDS FOR NAMED PLAINTIFFS

Also before the Court is Plaintiffs' request for an award of attorneys' fees and reimbursement of Class Counsel's expenses, and for an incentive award for the named Plaintiffs. As part of its fairness determination, the Court must assess the reasonableness of these requested awards. For the reasons stated below, the Court grants the application for attorneys' fees and expenses, and grants in part the application for an incentive award for the named Plaintiffs.

### A. Attorneys' Fees and Expenses

In light of the size of the substantial fund and the large number of persons benefited, the skill and efficiency of counsel, the complexity and duration of the underlying actions, the Class Counsel's risk of nonpayment in this contingent litigation, the efforts and amount of time that Class Counsel spent on the litigation, and awards in similar insurance sales practices cases, this Court finds that the requested attorneys' fees and expenses are reasonable and warrant approval. As discussed in more detail below, the requested attorneys' fees and expenses of $58.2 million is approximately 7.58% of the Settlement's benefit to the Class, is 2.83 times Class Counsel's actual lodestar of over $19,659,439.50,[26] and is within the range of

fee awards approved in cases of similar magnitude and complexity.

In a class action settlement, the court must thoroughly analyze an application for attorneys' fees, even where the parties have consented to the fee award. *GM Trucks*, 55 F.3d at 820 (explaining that consent is not determinative because of a " 'danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees.' ") (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir.1991)). "The district court employs its discretion to fix the amount of attorney's fees and expenses." *Reinhart v. Lucent Techs.* ("*Lucent II*"), 327 F.Supp.2d 426, 431 (D.N.J.2004) (citing *GM Trucks*, 55 F.3d at 783, 821). "Determining an appropriate award, however, is not an exact science." *Id.* at 431. Rather, the facts unique to each case are relevant to the amount of any award. *Id.*

### 1. Method for Determining Fee Award

In order to evaluate the reasonableness of a particular attorneys' fee request, the Court must first determine the type of action that is being adjudicated and then apply the appropriate method of awarding fees. "Relevant law evidences two basic methods for evaluating the reasonableness of a particular attorneys' fee request—the lodestar approach and the percentage-of-recovery approach. Each has distinct attributes suiting it to particular types of cases." *Prudential I*, 962 F.Supp. at 578. "The lodestar method calculates fees by multiplying the number of hours expended by some hourly rate appropriate for the region and for the experience of the lawyer." *GM Trucks*, 55 F.3d at 819 n. 37. The lodestar method is properly used in statutory fee shifting cases. *See id.* "The percentage of recovery method resembles a contingent fee in that it awards counsel a variable percentage of the amount recovered for the class." *Id.* at 819 n. 38. "[T]he percentage-of-recovery method is

---

26. As reflected in Class Counsel's individual affidavits submitted in support of Plaintiffs' request (Docket Entry # 32), the lodestar is based on the hourly rate of the attorneys and professional staff at each firm times the number of hours actually expended by them, as of September 15, 2004, in this and the underlying cases.

used in common fund cases on the theory that class members would be unjustly enriched if they did not adequately compensate counsel responsible for generating the fund." *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 128 (D.N.J.2002). "While either the lodestar or percentage-of-recovery method should ordinarily serve as the primary basis for determining the fee, the Third Circuit has instructed that it is sensible to use the alternative method to double check the reasonableness of the fee." *Prudential I*, 962 F.Supp. at 578.

Although this Settlement is not strictly speaking a common fund case, the Court finds it is analogous in that the fees and Class award would be paid by the Defendants and a common fund has been established for the Class. Moreover, in similar insurance sales practices class action settlements, the courts in this Circuit have found that the percentage-of-recovery method was the appropriate approach. *Prudential II*, 148 F.3d at 333; *Roy v. Indep. Order of Foresters*, Civil Action No. 97–6225, at 52(SRC) (Pl. Final Approval Brief, Greenberg Aff., Ex. A.). The rationale for calculating fees on the percentage-of-recovery method in a common fund case is that "it is consistent with the private marketplace where contingent fee attorneys are routinely compensated on a percentage of recovery method," and "it provides a strong incentive to plaintiffs' counsel to obtain the maximum possible recovery in the shortest time possible under the circumstances." *Manners v. American General Life Ins. Co.*, 1999 WL 33581944, at *29, 1999 U.S. Dist. LEXIS 22880, at *86–87.

### 2. Application of the Percentage–of–Recovery Method

▮ In assessing Class Counsel's requested fee, the Court will rely primarily upon the percentage-of-recovery method, and will use the lodestar method solely as a cross-check. *Prudential I*, 962 F.Supp. at 578. Utilizing the percentage-of-recovery method, the court must first value the proposed settlement and then decide what percentage of the settlement should be awarded as fees. *GM Trucks*, 55 F.3d at 822. In

determining the value of the proposed settlement the court must "determine a precise valuation of the settlement on which to base its award." *Id.* Next, in determining the appropriate percentage to award as fees, "the percentage of recovery customarily awarded in class actions in the Third Circuit and elsewhere generally ranges from nineteen to forty-five percent of the settlement fund." *Roy v. Indep. Order of Foresters*, Civil Action No. 97–6225, at 54(SRC) (Pl. Final Approval Brief, Greenberg Aff., Ex. A.) (awarding 12.7% of the total recovery of $114.2 million); *see also Lucent II*, 327 F.Supp.2d at 439–42 (collecting data on fee awards in common fund cases demonstrating that "more than twenty relatively recent class action decisions in the Third Circuit reflect fee awards between 33 1/3% and 22.5%" and "where cases involving comparable risks to the ones in this matter have settled for more than $100 million, courts have typically awarded fees in the range of 25% to 30%").

▮ "Many courts, including several in the Third Circuit, have considered 25% to be the 'benchmark' figure for attorney fee awards in class action lawsuits, with adjustments up or down for significant case-specific factors." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 262 (D.Del.2002) (gathering case law and awarding 22.5% in fees on a $10.01 million settlement fund). " 'Courts typically decrease the percentage of the fee as the size of the fund increases.' " *In re Alloy, Inc. Sec. Litig.*, 2004 WL 2750089, at *2, 2004 U.S. Dist. LEXIS 24129, at *8 (S.D.N.Y. Dec. 2, 2004) (quoting *Karpus v. Borelli (In re Interpublic Secs. Litig.)*, 2004 WL 2397190 at *11, 2004 U.S. Dist. LEXIS 21429 at *33 (S.D.N.Y. Oct. 26, 2004) (setting the fee award at 12% of $ 96.4 million where plaintiffs' counsel had sought 17%)). "But there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund. Put simply, the declining percentage concept does not trump the fact-intensive Prudential/Gunter analysis." *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 302–03 (3d Cir.2005). Ultimately, however, the determination of a reasonable fee award is well within the court's sound discretion. *In re*

*Alloy, Inc. Sec. Litig.,* 2004 WL 2750089, at *2, 2004 U.S. Dist. LEXIS 24129, at *8.

As previously discussed [27] the value of the Settlement is "at least $698.7 million, plus the value of injunctive relief and Part VIII ADR Relief as well as legal fees, expenses and administrative costs." (Long Decl. at 6). This amounts to approximately $771.9 million value to the Class.[28] The requested attorneys' fees and expenses of $58.2 million is approximately 7.58%[29] of the Settlement's benefit to the Class. While this may seem reasonable it is not the end of this Court's fairness analysis.

### 3. The *Gunter* Analysis

In awarding attorneys' fees using the percentage-of-recovery method in a common fund class action, the Court is guided by the standards set forth in *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000). Those standards include:

(1) the size of the fund and the number of persons benefited;

(2) the presence or absence of substantial objections by class members to the fee amount;

(3) the skill and efficiency of counsel;

(4) the complexity and duration of the action;

(5) the risk of nonpayment;

(6) the amount of time that counsel spent on the case; and

(7) awards in similar cases.

*Gunter,* 223 F.3d at 195 n. 1 (citations omitted). These factors "need not be applied in a formulaic way" because "in certain cases, one factor may outweigh the rest." *Gunter,* 223 F.3d at 195 n. 1. Each of these factors supports the requested award.

**27.** *See supra* section II(E).

**28.** The $771.9 million estimated total benefit to the Class is comprised of the following: CRP and GPR of at least $698.7 million; $58.2 million in attorneys' fees and reimbursement of expenses; and $15 million in administrative expenses. (Pl. Fee Brief at 18–19.) As of September 2004, Class Counsel had incurred $2.584 million in expenses, which is less than 1% of the settlement value. (*Id.* at 32.)

### (a) Size of Fund and Number of Persons Benefited

The size of the settlement fund and the number of policyholders benefited by the settlement is one consideration in evaluating a request for attorneys' fees and expenses. *Gunter,* 223 F.3d at 195 n. 1. As was previously articulated, the general rule is that as the settlement fund increases, the percentage awarded as a fee decreases. *Prudential II,* 148 F.3d at 339. The rationale for this concept is the belief that the increase in recovery is "merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Id.*

Here, the settlement fund contains the third largest class action settlement for deceptive insurance sales practices, well behind *Prudential* and *MetLife.* This Proposed Settlement involves about three million policies and a settlement value of at least $698.7 million, plus the value of injunctive relief, Part VIII ADR Relief, attorneys' fees and expenses, and administrative costs. (*See* Perrott Aff., Ex. B at 2; Long Decl. at ¶ 1). Plaintiffs seek a fee for Class Counsel that roughly equals 7.58% of the settlement benefit. Viewing the value of the settlement relief in relation to the percentage, this is significantly lower than that found appropriate in *Prudential* and *MetLife.*

As set forth in footnote three above, the settlement in *Prudential* involved in excess of eight million Class Members and a settlement value of between $1.209 billion and $2.077 billion, *see Prudential I,* 962 F.Supp. at 495, 510, and *MetLife's* settlement involved in excess of six million Class Members and a settlement value of $1.645 billion, *see MetLife,* 1999 U.S. Dist. LEXIS 22688, at *30, 44–45. In *Prudential,* 7.5% was found appropriate, and in *MetLife,* 7% was approved. (*See* Chart, *infra* at 253–54).

**29.** Although this is the way Class Counsel presented the numbers to the Court, if the expenses were removed and the percentage were recalculated on a request for only attorneys' fees of $55,616,000 ($58.2 million requested less the $2.584 million in expenses), the percentage-of-recovery would be approximately 7.2% of the Settlement's benefit to the Class.

This factor favors the fee request based upon the way the Settlement is structured-guaranteeing relief to every permanent policy holder either through GPR or CRP, and giving CRP relief to every term or disability policyholder with a Delayed Coverage or Juvenile Smoker claim. Thus, based on the size of the fund and the substantial guaranteed benefit to the Class, this factor weighs in favor of a finding that the requested fees and expenses are reasonable.

### (b) Presence or Absence of Substantial Objections

The Class Notice disseminated to potential Class Members, and the Publication Notice, advised Class Members that:

> At the Fairness Hearing, Class Counsel will ask the Court for an award of attorneys' fees and expenses not to exceed $58.2 million in fees and expenses to be paid by MassMutual....
>
> **You will *not* be required to pay any portion of these attorneys' fees, expenses or awards. Payment of attorneys' fees and expenses to Class Counsel is in addition to payment of benefits to Class Members and will not reduce any funds or benefits to Class Members and will not reduce any funds or benefits being made available to you.**

(Class Notice at 12 (emphasis in original)). The Notice also provided that Class Members, who did not opt out, had the right to file an objection with the Court and appear at the Fairness Hearing. Around forty-five of the objections received by the Court asserted that the attorneys' fees were excessive.

For good reason, the request for expenses was not an issue with the objectors. As of September 2004, Class Counsel had spent over $2.584 million in their own funds to pay the expenses that arose through this litigation. Defendants do not object, and the Court finds no reason to question the numbers reported to the Court by way of Class Counsel's affidavits.

Having read and reread the objections, the Court overrules the objections to the award of attorneys' fees for several reasons. First, the Court received fewer than fifty objections to the requested attorneys' fees out of the more than three million Class Members. Such a small number of objections in relation to the size of the Class favors approval of the request. *See, e.g., In re Cendant Corp. Deriv. Action Litig.,* 232 F.Supp.2d 327, 338 (D.N.J.2002). The majority of these voiced disapproval as to the fee request as being excessive. Second, the objectors overlook the enormous benefit to the Class that was achieved through the perseverance and skill of Class Counsel. In addition, they fail to acknowledge that the fee is being paid by MassMutual, the alleged wrongdoer, and that it is not coming out of the settlement fund. The fees and expenses are being paid over and above the GPR and CRP. Third, the objections reflect a profound misunderstanding as to the contentious character of this litigation over the past nine years and the significant risk of non-recovery that was faced by Plaintiffs and Class Counsel. They simply fail to recognize the strong likelihood that if these Class Counsel had not undertaken this litigation that there would be no settlement. Class Counsel have spent approximately nine years litigating these cases against MassMutual, they have incurred substantial fees and expenses, and they have not yet received a dime for all of their exceptional work to date.

Lastly, as for objector Beckett's argument, at the Fairness Hearing and in his written objection, that the Court should pay the attorneys' fees in installments, or "stage" the fees, the Court finds no merit in the objection. (*See* Tr. at 81–82; Beckett Obj., Plante Aff. # 2). While that has been done in other settlements, in *Prudential* and *Duhaime,* where there was significant post-settlement monitoring or an uncapped ADR process, neither of those are of concern here. Here, the settlement value is known to within a very narrow range, as explained by Plaintiffs' expert actuary Mr. Long.

Moreover, the vast majority of courts have provided for the full fee to be paid at once in other insurance sales practices settlements. *See, e.g., Snell,* 2000 WL 1336640, at *19–20, 2000 U.S. Dist. LEXIS 1336640, at *61–62 (awarding $6.6 million fee request); *MetLife,* MDL No. 1091 (W.D.Pa. July 26, 2000)

(Greenberg Aff., Ex. C, Docket Entry # 32) ($120 million fee award authorized for payment in full); *Manners,* 1999 WL 33581944, at *32, 1999 U.S. Dist. LEXIS 22880, at *95 (approving $19.5 million in fees and expenses); *Roy,* at 45–46 (Pl. Final Approval Brief, Greenberg Aff., Ex. A); *Lee v. U.S. Life Corp.,* Civil Action No. 1:97CV–55–M (W.D.Ky. July 2, 1999) (Greenberg Aff., Ex. H), at 64; *Garst v. Franklin Life Ins. Co.,* 1999 U.S. Dist. LEXIS 22666, at *91; *Elkins,* 1998 WL 133741, at *36, 37, 1998 U.S. Dist. LEXIS 1557, at *107 (approving request for $5 million in attorneys' fees and expenses). The Court also adds that these Class Counsel have a strong track record of following such settlements through to the end. (Friedman Decl. ¶ 149). *See In re the Prudential Ins. Co. of Am. Sales Practices Litig.* ("*Prudential III*"), 106 F.Supp.2d 721, 734 (D.N.J.2000) (noting performance of Class Counsel in zealously representing the Class "[e]ven in the time since the settlement in this matter was finally approved").

In sum, the Court adopts the reasoning set forth in the Brief of Plaintiffs and Class Counsel in Opposition to Objections to Requested Incentive Awards and Attorneys' Fees. (*See* Docket Entry # 125). Thus, this factor also supports the presumption that the requested fee is reasonable.

### (c) Skill and Efficiency of Counsel

The purpose of a fee award "is to ensure 'that competent counsel continue to undertake risky, complex, and novel litigation.'" *In re Safety Components, Inc. Sec. Litig.,* 166 F.Supp.2d 72, 96 (D.N.J.2001) (quoting *Gunter,* 223 F.3d at 198). The subject litiga-

tion against MassMutual began in 1995. Many cases alleging deceptive insurance sales practices against MassMutual [30] and other insurance companies [31] failed over the years, either on dispositive motions or at the class certification stage. Given such a poor track record of success in this type of case, Class Counsel had to exercise great skill and dedication in jumping these hurdles with such success that MassMutual was willing to discuss a nationwide settlement with Class Counsel so as to resolve these cases. This opinion has already set forth the history of the litigation against MassMutual and sees no reason to repeat it, but to say that it underscores the high caliber performance and industriousness of Class Counsel in this litigation and shows that purposes of awarding attorneys' fees in such cases will have been fulfilled.

In addition, the Court notes the significance that, in this case, Class Counsel did not begin negotiating their fee until all of the settlement terms for the Class had been fully negotiated. (Pl. Fee Brief at 1.) *See Prudential I,* 962 F.Supp. at 577, *aff'd,* 148 F.3d at 335 (noting that parties properly negotiated settlement before negotiating attorneys' fees); *cf. Prandini v. National Tea Co.,* 557 F.2d 1015 (3d Cir.1977) (rejecting a settlement agreement which contained an award of attorneys' fees, holding class counsel should not simultaneously negotiate both a settlement and the attorneys' fees).

### (d) Complexity and Duration of Litigation

In *Gunter,* the Third Circuit stated that "[t]he complexity and duration of the litiga-

---

30. *See, e.g., Shocklee,* 369 F.3d 437; *Markarian,* 202 F.R.D. 60 (class certification was denied and plaintiff's appeal was dismissed with prejudice on March 13, 2002); *Cunningham,* No. 4:95–CV–417–B–B (N.D.Miss.) (the case settled and a judgment dismissing the case with prejudice was entered on March 4, 2000); *Thelen,* 111 F.Supp.2d 688; *Cohn,* 189 F.R.D. 209; *McCown,* No. 01–03867 (193rd Jud. Dist. Dallas County, Tex.) (the appellate court affirmed the denial of class certification and dismissed the entire case on April 22, 2004); *Solomon,* 47 Pa. D & C 4th 36, 2000 WL 33116006; *O'Brien,* No. 96–0160 (Mass. Superior Ct.) (the case settled and was dismissed by the court on March 20, 2000); *Elliott,* No. 333733 (Az. Superior Ct.) (the court granted MassMutual's motion for summary judg-

ment and pursuant to the parties' stipulation, the case was dismissed on September 9, 2002).

31. *See, e.g., S–G Metals Indus. Inc. v. New England Life Ins. Co.,* 346 F.3d 218 (1st Cir.2003); *McCord v. Minn. Mut. Life Ins. Co.,* 346 F.3d 830 (8th Cir.2003); *Hawkins v. Aid Ass'n for Lutherans,* 338 F.3d 801 (7th Cir.2003); *Moore v. Paine-Webber, Inc.,* 306 F.3d 1247 (2d Cir.2002); *In re LifeUSA,* 242 F.3d 136 (3d Cir.2001); *In re Northwestern Mut. Life Ins. Co. Sales Practices Litig.,* 70 F.Supp.2d 466 (D.N.J.1999), *aff'd,* 259 F.3d 717 (3d Cir.2001); *In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 183 F.R.D. 217 (W.D.Mich.1998); *Banks v. New York Life Ins. Co.,* 737 So.2d 1275 (La.1999).

tion is the first factor a district court can and should consider in awarding fees." *Gunter*, 223 F.3d at 197. It is axiomatic that if the litigation were short and sweet a proportionally large fee award would be a windfall to Class Counsel. This is not the situation here.

As previously set forth, this Settlement is the culmination of multiple cases, one of which started almost eight years ago and had a trial date set. The other cases have also sustained a long duration of hotly contested litigation. Liability, damages and class certification were issues that arose in these cases for which Class Counsel had to strategize and overcome. In addition, the settlement negotiations lasted about one year and were tenuous, at best, right up until the end.

Overall, this factor supports the fee request.

### (e) Risk of Non–Payment

Class Counsel undertook these cases against Defendants solely on a contingent basis. Not only did they expend a large amount of time representing Plaintiffs, but they also paid out millions of their own dollars in expenses so they could depose witnesses, obtain experts, and pay for other litigation costs. Class Counsel did not have the assistance of a governmental agency pursuing Defendants, rather they had to pursue these large well-funded Defendants on their own. *See Lucent II*, 327 F.Supp.2d at 436 (commenting that lead counsel had "achieved results without the aid of a governmental investigation"). As previously set forth, many of the deceptive insurance sales practices cases against Defendants and other insurers failed. So, despite years of litigation, albeit with some progress, Class Counsel persevered facing a significant risk of non-payment.

As the court stated in *Lucent II*, "the intrinsically speculative nature of this contingent fee case enhances the risk of non-payment and bolsters the Court's analysis under this factor." *Lucent II*, 327 F.Supp.2d at 438. Thus, this factor also supports approval of the fee request.

### (f) Amount of Time that Counsel Devoted to Case

As evidenced by the 63,037.35 hours spent by Class Counsel in these cases, an enormous amount of time was devoted to prosecuting these cases. (*See* Affidavits Accompanying Fee Brief). Over the course of years, it is reasonable that so much time would have been spent on these complex cases, particularly given the excellent counsel of Defendants and their contested nature. The $58.2 million requested fee is the total fee Class Counsel will receive, despite the continuing responsibilities they will have in responding to Class Member inquiries, assisting the Claim Evaluator, consulting on individual cases, and any post-judgment proceedings and appeals. Therefore, this Court finds that this factor likewise supports approval

### (g) Awards in Similar Cases

In evaluating Class Counsel's request for approximately 7.58% of the total settlement value to the Class, the Court must consider awards in similar cases. *Gunter*, 223 F.3d at 195 n. 1; *Lucent II*, 327 F.Supp.2d at 439. In an effort to provide policyholders and Class Members with an exacting analysis of the fairness of the requested attorneys' fees, the Court has compiled and considered the following common fund cases involving similar claims of deceptive insurance sales practices that also utilized the percentage-of-recovery method:

| CASE | RECOVERY | PERCENT AWARDED |
|---|---|---|
| *In re the Prudential Ins. Co. of Am. Sales Practices Litig. ("Prudential III")*, 106 F.Supp.2d 721 (D.N.J.2000) | $1.8 billion | 7.5% (found appropriate) |
| *In re Metropolitan Life Ins. Co. Sales Practices Litig.*, Misc. Docket No. 96–179 (W.D.Penn. July 26, 2000) | $1.645 billion | 7% |

| | | |
|---|---|---|
| *Manners v. American General Life Ins. Co.*, Civil Action No. 3–98–0266, 1999 WL 33581944, 1999 U.S. Dist. LEXIS 22880 (M.D.Tenn. Aug. 11, 1999) | $169 million | 11.5% |
| *Roy v. Indep. Order of Foresters*, Civil Action No. 97–6225 (D.N.J. Aug. 3, 1999) | $114.2 million | 12.7% |
| *Garst v. Franklin Life Ins. Co.*, No. 97–C0074–S, 1999 U.S. Dist. LEXIS 22666 (N.D. Ala. June 28, 1999) | $90.1 million | 14.5% |
| *In re Mfrs. Life Ins. Co. Premium Litig.*, MDL No. 1109, Master File No. 96–CV230, 1998 WL 1993385, 1998 U.S. Dist. LEXIS 23217 (S.D.Cal., Dec. 21, 1998) | $555.1 million | 6.5% |
| *Elkins v. Equitable Life Ins. Co.*, Civil Action No. 96–296–CIV–T–17B, 1998 WL 133741, 1998 U.S. Dist. LEXIS 1557 (M.D.Fla. Jan. 28, 1998) | $278.8 million | 1.7% [32] |
| *Michels v. Phoenix Home Life Ins. Co.*, Index No. 5318–95, 1997 N.Y. Misc. LEXIS 171 (N.Y. Sup.Ct., Albany County Jan. 3, 1997) | $100 million | 9% |
| *Willson v. New York Life Ins. Co.*, Index No. 94/127804, 1995 N.Y. Misc. LEXIS 652 (N.Y. Sup.Ct., N.Y. County Nov. 8, 1995) | $300 million | 7% |

At this point in the analysis, were the Court to ignore the precedent, namely the 25% "benchmark" for a fee award, *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. at 262, and the 19%–45% range generally applied in class actions, *Roy*, Civil Action No. 97–6225, at 54, and were the Court to rely solely on a review of these recent insurance sales practices settlement shown on the above chart, the Court could conclude that an award of even 9.5% would be appropriate given the tremendous value of this Settlement to the Class Members. However, Plaintiffs only seek 7.58% in attorneys' fees and expenses, and as in *Prudential*, this Court will not award more than that to which the parties agreed. Plaintiffs argue, and this Court agrees, that the 7.58% is well within the range permitted in the this district and the Third Circuit, and virtually identical to the 7.5% that Judge Wolin found appropriate in *Prudential III*, 106 F.Supp.2d at 734 & n. 9 (but awarding only 4.8% because that is what the parties had agreed to).

Therefore, this factor overwhelmingly favors approval of the Settlement.

**4. Application of the Lodestar Recovery Method**

 Although the Court is satisfied that its fees calculation is reasonable in light of the *Gunter* factors and awards in similar cases, the Court will nonetheless double-check its result by applying the lodestar method. The Court shall check its percentage-of-recovery calculation against a lodestar method calculation to be sure that the percentage awarded does not amount to an unreasonable hourly fee. *See GM Trucks*, 55 F.3d at 822. To determine an attorney's lodestar award the Court multiplies "the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *Gunter*, 223 F.3d at 195 n. 1. The Court may then multiply the lodestar calculation to take into account the risks of non-recovery, to provide a reward for an extraordinary result, or to encourage counsel to continue to undertake important litigation. *Safety Components*, 166 F.Supp.2d at 102. "The Third Circuit has held that the lodestar may be

---

**32.** The Court disregards the anomaly in *Elkins* because, there, the "lodestar" of plaintiffs' counsel only totaled $2,038,170.13, *see* 1998 WL 133741, at *35–36, 1998 U.S. Dist. LEXIS 1557, at *104, as compared to the "lodestar" of $19,659,439.50 in this case.

increased or decreased by the Court after considering (1) 'the contingent nature of success' and (2) 'the quality of the attorney's work.'" *In re Residential Doors Antitrust Litig.*, 1998 WL 151804, at *10, 1998 U.S. Dist. LEXIS 4292, at *30 (quoting *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 168 (3d Cir.1973)); *see also Gunter*, 223 F.3d at 195 n. 1.

█ Each firm involved in this matter has provided the Court with a summary[33] of their firm's professional time, including the name of each person who worked on the case, his or her current hourly billing rate, and the number of hours expended on this matter. At the outset, the Court recognizes that this is significant in that counsel have provided the Court with affidavits listing everyone that worked on the case and their time and rate, thus allowing the Court to apply a blended rate in determining the multiplier. *See, e.g., In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 298–99 ("In performing the lodestar cross-check, the district courts should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter."). In *Rite Aid*, the Third Circuit vacated the district court's award of attorney's fees and remanded because the Court failed to apply a blended rate for all the attorneys that had worked on the matter. *Id.* ("Had the hourly rates been properly blended, taking into account the approximate hourly billing rates of the partners and associates who worked on the case, the multiplier would have been a higher figure, alerting the trial court to reconsider the propriety of its fee award." (footnote omitted)).

To summarize, the firm of Lite DePalma Greenberg & Rivas, LLC provided services in *Varacallo v. Massachusetts Mutual Life Ins. Co.*, Docket No. ESX–L–3403–97 (Supe-

rior Court of New Jersey, Law Division, Essex County), and other sales practices cases against MassMutual over the past eight years (*Russo v. MassMutual*, CV 96–0368 (Supreme Court, Tompkins County, New York), *Gass v. MassMutual*, Civil Action No. CV–2000–05–1010 (Court of Common Pleas, Summit County, Ohio), *Elliot v. MassMutual*, Case No. 333733 (Superior Court, Pima County, Arizona), and the present action). (Affidavit of Bruce D. Greenberg, in Support of Joint Petition for Award of Attorneys' Fees and Reimbursements of Expenses and Class Representatives' Incentive Award "Greenberg Fee Aff." at 2, Docket Entry # 32). Through September 15, 2004, this firm spent 3,947.8 hours on this litigation, which results in a total lodestar of $1,586,410.25. (*Id.*).

Through September 14, 2004, the firms of Leach Coughlin Stoia Geller Rudman & Robbins LLP and Milberg Weiss Bershad & Schulman LLP[34] spent 19,859.50 hours on this litigation, which results in a total lodestar of $5,141,410.50. (Affidavit of John J. Stoia, Jr. and Barry A. Weprin in Support of Joint Petition for Award of Attorneys' Fees and Reimbursement of Expenses and Class Representatives' Incentive Award ("Stoia Fee Aff.") at 2, Docket Entry # 32).

Through September 15, 2004, the firm of Finkelstein & Krinsk LLP spent 6,316.35 hours on this litigation (including this action and *Karges*), which results in a total lodestar for this firm's professional time of $2,438,894.25. (Affidavit of Howard D. Finkelstein in Support of Joint Petition for Attorneys' Fees and Expenses ("Finkelstein Fee Affid.") at 2, Docket Entry # 32).

The firm of Specter Specter Evans & Manogue, P.C., from August 22, 1996 through September 15, 2004, spent 7,390.70 hours on this litigation (including this action, *Varacal-*

---

33. "The lodestar cross-check calculation need entail neither mathematical precision nor beancounting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 306–07 (footnote omitted). Thus, any objection to Class Counsel providing the Court with billing summaries is overruled. (*See* Costello/Robertshaw Obj., Docket Entry # 66).

34. Counsel explain that on May 5, 2004, certain counsel for Plaintiffs, formerly associated with Milberg Weiss Bershad Hynes & Learch LLP, changed their law firm affiliation to Lerach Coughlin Stoia & Robbins LLP. Also, since that date, the firm names have also changed to those mentioned above.

*lo* and *Gass*) amounting to a lodestar of $2,575,450.00 for this firm's professional time. (Affidavit of Joseph N. Kravec, Jr. in Support of Joint Petition for Award of Attorney Fees and Reimbursement of Expenses and Class Representatives' Incentive Award ("Kravec Fee Aff.") at 2, Docket Entry # 32).

The firm of Bonnett, Fairbourn, Friedman & Balint, P.C. spent a total of 25,523.3 hours on this litigation through September 15, 2004. (Affidavit of Andrew S. Friedman in Support of Joint Petition for Attorneys' Fees and Expenses ("Friedman Fee Aff.") at 2, Docket Entry # 32). The total lodestar for these services is $7,917,274.00. (*Id.*).

In sum, this analysis results in a total lodestar of $19,659,439.50. Dividing that lodestar into the requested fee award, $58,200,000, less Class Counsel's expenses already advanced by Class Counsel, $2,584,468.09, yields a fee multiplier of approximately 2.83. A 2.83 multiplier is reasonable under the circumstances. The Third Circuit has even recognized that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Prudential II*, 148 F.3d at 341 (quoting 3 *Newberg* § 14.03 at 14–5). Plaintiffs point out that the multiplier will eventually be lower because Class Counsel would incur additional time after the September date which served as a cutoff date, such as final approval briefing, attending the Fairness Hearing, and assisting with claim administration. (Pl. Fee Brief at 31).

Considering the complexity of this litigation, and the considerable effort and skill which Class Counsel has exhibited in achieving this Settlement, the Court believes that the requested fee and expense award of $58.2 million is reasonable.

**5. Reimbursement of Expenses**

As part of the $58.2 million for attorneys' fees and expenses, Class Counsel seeks reimbursement of expenses of $2,584,468.09 incurred in handling this litigation.[35] This total is based on submissions from the five firms who represented the Plaintiffs in these cases.[36] The relevant details regarding these expenses are set forth in the separate affidavits submitted by Class Counsel on behalf of each of their firms. To summarize, however, the expenses are for: (1) litigation fund contributions, (2) class notice expenses, (3) court reporters, (4) Lexis/Westlaw/online library research, (5) experts/consultants/investigators, filing/document fees, (6) witness fee/service of process, (7) meals, hotels and transportation, (8) messengers and express services, (9) photocopying, document imaging/scanning/coding, (10) postage, (11) special secretarial/word processing, and (12) telephone and facsimile. Such fees have been held to be reasonably incurred in the prosecution of such litigation. *See Yong Soon Oh v. AT & T Corp.*, 224 F.R.D. 357, 369 (D.N.J. 2004).

The Court is satisfied that the affidavits and briefs of Class Counsel demonstrate that the requested expenses "were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *In re Cendant*, 232 F.Supp.2d at 343; *see also Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir.1995); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 151 (E.D.Pa.2000) (finding that photocopying expenses, telephone and facsimile charges, postage, and messenger and express mail service charges were reasonably incurred in

---

**35.** The listed expenses were as of mid-September 2004.

**36.** The firm of Lite DePalma Greenberg & Rivas, LLC incurred $336,019.06 in expenses in this litigation through September 15, 2004. (Greenberg Fee Aff. at 2). The firms of Leach Coughlin Stoia Geller Rudman & Robbins LLP and Milberg Weiss Bershad & Schulman LLP incurred $816,001.03 in unreimbursed expenses in connection with the prosecution of this litigation through September 14, 2004. (Stoia Fee Aff. at 2). Also, from February 8, 1999, through September 15, 2004, the firm of Finkelstein & Krinsk

LLP incurred expenses totaling $355,553.27. (Finkelstein Fee Aff. at 2). The firm of Specter Specter Evans & Manogue, P.C., from August 22, 1996 through September 15, 2004, incurred $430,060.44 in unreimbursed expenses. (Kravec Fee Aff. at 2). The firm of Bonnett, Fair bourn, Friedman & Baling, P.C. expended a total of $646,835.29 in unreimbursed expenses in connection with the prosecution of this litigation (including this action, *O'Brien, Russo, Varacallo, Karges, Gass, Wofford,* and *Elliott*) through September 15, 2004. (Friedman Fee Aff. at 2).

prosecuting the weighty lawsuit.). None of the amounts appear to be excessive and all were incidental to the litigation. In fact, their expenses will be more because they only listed those through mid–September. However, they are only seeking $58.2 million for attorneys' fees and expenses, and will not be receiving any additional reimbursement. Moreover, the $2,584,468.09 in expenses amounts to less than 1% of the settlement value. Accordingly, their request for reimbursement of expenses is approved.

In sum, the Court determines that the fees and expenses awarded here appropriately reflect a careful analysis of all the *Gunter* factors under the percentage-of-recovery approach and its cross-check under the lodestar methodology, particularly given the separate nature of the fee and settlement negotiations. The Court finds that the fee negotiations were conducted in good faith, free of any collusion, and provide a substantial benefit to the Class since the fees will not be paid out of the settlement fund. Given all of the facts and circumstances peculiar to this case, the award here is sufficiently appropriate for this particular case. For all of the reasons stated above, the Court will therefore approve the proposed fee and expense award of $58.2 million.

## B. Incentive Awards for Named Plaintiffs

■ Plaintiffs' application for an incentive award of $10,000 to be paid to each of the named Plaintiffs is granted in part and denied in part. The Court is mindful that " '[a]n incentive award is meant to compensate the named Plaintiff for any personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit.' " *Dornberger v. Metro. Life Ins. Co.,* 203 F.R.D. 118, 124 (S.D.N.Y.2001) (quoting *Berrios v. Sprint Corp.,* 1998 WL 1749828, at *3, 1998 U.S. Dist. LEXIS 22833, at *9 (E.D.N.Y.1998)); *see also Roberts v. Texaco,* 979 F.Supp. 185, 187–88 (S.D.N.Y.1997) (approving an incentive award for a named plaintiff who "provided valuable assistance to counsel in prosecuting the litigation"). "An incentive payment to come from the attorneys' fees awarded to

plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected." *In re Cendant Corp.,* 232 F.Supp.2d at 344. Since that is not the case here, and the requested incentive awards would be paid solely from the Claim Review Process fund, depleting the financial resources for Class Members, this Court carefully reviews this request to ensure its fairness to the Class.

The Settlement Agreement provides that "Class Counsel for Plaintiffs may petition the Court for incentive awards of up to $10,000.00 per Plaintiff to be paid to some or all of the Plaintiffs in the actions being resolved pursuant to this settlement .... to compensate the class representatives for efforts and risks taken by them on behalf of the Class. Any incentive awards made by the Court shall be paid solely from the CRP fund and under no circumstances shall Mass-Mutual be responsible for paying such an incentive award from its own funds." (S.A. § XI(E)). Plaintiffs have thus petitioned the Court for an award of $10,000 for each of the named Class Representatives.

The Court finds ample authority in this and other circuits for the approval of incentive awards. *See, e.g., Godshall v. Franklin Mint Co.,* 2004 WL 2745890, at *6, 2004 U.S. Dist. LEXIS 23976, at *21 (E.D.Pa. Dec. 1, 2004) (granting special award of $20,000 to each named plaintiff for their work as class representatives); *In re Linerboard Antitrust Litig.,* 2004 WL 1221350, *18–19, 2004 U.S. Dist. LEXIS 10532, *56–58 (E.D.Pa. June 2, 2004) (awarding $25,000 for each of the five class representatives); *Tenuto v. Transworld Sys.,* 2002 WL 188569, at *4–5, 2002 U.S. Dist. LEXIS 1764, at *13–14 (E.D.Pa. Jan. 31, 2002) (granting award of $2,000); *Dornberger,* 203 F.R.D. at 124–125 (approving an award of $10,000 for Dornberger and $1,500 for the eight sub-class representatives); *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 145 (E.D.Pa.2000) ("courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."); *In re Residential Doors Antitrust Litig.,* 1998 WL 151804, 1998 U.S. Dist. LEXIS 4292 (E.D. Pa. April

2, 1998) (awarding an incentive award of $10,000 to each of the four Class representatives); *In re Plastic Tableware Antitrust Litig.*, 1995 WL 723175, at *2, 1995 U.S. Dist. LEXIS 18166, at *7 (E.D.Pa. Dec. 4, 1995) (granting award of $3,000); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir.1998) (affirming award of $25,000 to named plaintiff); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 449 (S.D.Tex.1999) (granting awards of between $1,000 and $10,000); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 357 (N.D.Ga.1993) (granting award of $2,000 to plaintiffs that produced documents and awarding $5,000 to plaintiffs that were also deposed). The Court notes that while the amount requested, $10,000, is comparable to incentive awards granted by courts in this and other circuits, *see, e.g., Bogosian v. Gulf Oil Corp.*, 621 F.Supp. 27 (E.D.Pa.1985) (awarding $20,000); *Brotherton v. Cleveland*, 141 F.Supp.2d 907 (S.D.Ohio 2001) (awarding $50,000), incentive awards will not be freely distributed without a substantial basis to demonstrate that the individual provided services for the Class and incurred risks during the course of the litigation.

According to the affidavit of Mr. Kravec, Class Representatives Paul Varacallo, K. Werner Gass and Jeremiah B. Walsh devoted a considerable amount of time and effort in assisting counsel in prosecuting this matter. (Kravec Fee Aff. at 3). They provided day long deposition testimony of themselves and, in Mr. Varacallo's case, certain family members, they produced documents, reviewed pleadings and kept in regular contact with counsel to apprise themselves of and to comment on each stage of the litigation. (*Id.*). In addition, each Class Representative was actively involved in reviewing and commenting on the Proposed Settlement. (*Id.*). In addition to filing a case in New Jersey Superior Court, on March 25, 1997, Plaintiff Paul Varacallo submitted a Certification in support of the successful opposition of plaintiff and the certified New Jersey class to MassMutual's motion for summary judgment. (Greenberg Fee Aff. at 3). Mr. Gass also actively pursued an action against MassMutual in the Ohio Court of Common Pleas, filed on May 4, 2000. Plaintiff Jeremiah B. Walsh was named as a trial witness in the *Varacallo* Superior Court case. (Greenberg

Fee Affid. at 3). In addition to the foregoing, he had his deposition taken on a very snowy day on which he traveled from his home in Ocean County to Newark. (*Id.*). Lastly, Varacallo and Walsh were the only Class Representatives that attended the Fairness Hearing. (Tr. at 7).

Plaintiff Dr. Donald Wofford devoted a considerable amount of time and effort in assisting counsel in prosecuting this matter, including preparing for deposition, producing documents, reviewing pleadings, conducting factual investigations and keeping in regular contact with counsel to apprise himself of and to comment on each stage of the litigation. (Stoia Fee Aff. at 2–3). Dr. Wofford was also a named Plaintiff in a case against MassMutual in the California Superior Court. Further, Dr. Wofford was actively involved in reviewing and commenting on the Proposed Settlement. (*Id.*).

Plaintiffs William A. Karges, Jr. and Jeffrey M. Weiner, Esq. devoted a considerable amount of time and effort in assisting counsel in prosecuting this matter including providing multiple days of deposition testimony of both themselves and staff members, producing documents and reviewing pleadings. (Finkelstein Fee Aff. at 3). In addition, both Plaintiffs were actively involved in developing the litigation strategy, assisting and analyzing evidence, and reviewing and commenting on the Proposed Settlement. (*Id.*). Mr. Karges and Mr. Weiner were also involved in another case against MassMutual, filed on June 22, 1999 in the Superior Court of California.

Plaintiff Steven E. Feldman's involvement includes investing the time to file the Complaint in this matter, and standing ready to be deposed, produce documents, answer interrogatories, and otherwise serve as a class representative. (Pl. Fee Brief at 32–33). The Court has not received any evidence that Mr. Feldman had any involvement in any other action against Defendants other than participating in this class action Settlement.

Generally, the Class Representatives performed considerable work advancing the litigation. "Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly." *In*

*re Linerboard Antitrust Litig.,* 2004 WL 1221350, at \*18, 2004 U.S. Dist. LEXIS 10532, at \*56 (E.D. Pa. June 2, 2004). However, the Court finds that the involvement of each of the Class Representatives is not equal and any incentive award should not be distributed evenly as they requested. .

Thus, the Court concludes that Plaintiffs Paul Varacallo, K. Werner Gass, Dr. Donald Wofford, William A. Karges, Jr., and Jeffrey M. Weiner, Esq. worked very closely with Counsel throughout the entire litigation of this matter and were invaluable to bringing about this Settlement. Their request for a $10,000 incentive award is reasonable and that request is granted. Plaintiffs Jeremiah B. Walsh and Steven E. Feldman, however, had only minimal involvement. Mr. Feldman only participated in this Settlement; he was not deposed and was not required to produce documents. Mr. Walsh, on the other hand, attended a deposition, produced documents, and attended the Fairness Hearing in this Court, thus any incentive award to him should be greater. While the Court finds that the latter two Class Representatives were minimally involved in this litigation, they were, nevertheless, necessary in obtaining this Settlement. Therefore, the Court will award $3,000 to Mr. Walsh and $1,000 to Mr. Feldman.

### CONCLUSION

For the reasons explained above, this Court grants final class certification under Rules 23(a), (b)(2), and (b)(3), and finds that the Settlement is fair, adequate and reasonable and determines the parties motions for final approval of the Settlement [114 & 116] are GRANTED. This Court has issued with this Opinion a Final Judgment and Order certifying the Class, approving the Settlement and dismissing with prejudice the claims in this Action in accordance with the Settlement Agreement.

Additionally, as set forth in the Court's Final Order Approving Class Action Settlement, all Class Members who have not been timely excluded from the Class are permanently barred and enjoined from participating in any other action that is in any way related to the Released Transactions.

Plaintiffs' request for an award of attorneys' fees and reimbursement of Class Counsel's expenses [32] is GRANTED. The Court awards attorneys' fees and reimbursement of the expenses to Class Counsel in the amount of $58.2 million to be paid by Mass-Mutual. Also, as set forth in the Settlement Agreement, Class Counsel would have the sole discretion to allocate and distribute the award of fees and expenses among all of the counsel who acted on behalf of the Class. (*See* S.A. at § XI(B)).

Plaintiffs' request for $10,000 incentive awards for each of the named Plaintiffs [32] is GRANTED in part and DENIED in part. The request of Plaintiffs Paul Varacallo, K. Werner Gass, Dr. Donald Wofford, William A. Karges, Jr., and Jeffrey M. Weiner, Esq. is GRANTED and they will each receive $10,000 from the Claim Review Process fund. The request of Plaintiffs Jeremiah B. Walsh and Steven E. Feldman for $10,000 is DENIED in part. As set forth above, Jeremiah B. Walsh will receive $3,000 and Steven E. Feldman will receive $1,000 from the Claim Review Process fund.

Lastly, as explained in the Court's Final Order Approving Class Action Settlement, and stated in the Final Judgment, filed herewith, this Court retains continuing jurisdiction over this action.